## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**JOHN A. ORTLAND**                                                                    **PLAINTIFF**

**VS.**                        CIVIL ACTION NO: _1:07 CV 1075-LG-RHW_

**HARRISON COUNTY, MISSISSIPPI,**
**by and through its Board of Supervisors**
**HARRISON COUNTY SHERIFF DEPARTMENT,**
**SHERIFF DAVID BRISOLARA officially, FORMER SHERIFF**
**SHERIFF GEORGE PAYNE in his former official and**
**individual capacity, DIRECTOR OF CORRETIONS**
**MAJOR DIANNE GASTON-RILEY, officially and in her**
**individual capacity, FORMER BOOKING SUPERVISOR**
**CAPTAIN RICK GASTON, in his former official capacity and  individual capacity,**
**TRAINING DIRECTOR CAPTAIN PHIL TAYLOR, in his official and individual**
**capacity,1MEDICAL ADMINISTRATOR, PAT OLSON, officially, FORMER**
**MEDICAL ADMINISTRATOR DAVID  DECELLE, in his former official**
**and individual capacity, HEALTH ASSURANCE LLC, and OTHER UNKNOWN**
**ENTIYS 1 through 10, and JOHN and JANE DOES A-Z, also in their official and**
**individual capacities.**

                                                                    **DEFENDANTS**

### SECOND AMENDED COMPLAINT

### (THE PLAINTIFF DEMANDS A TRIAL BY JURY )

        COMES NOW, Plaintiff, John A. Ortland, pro se, and for cause of action against the

aforementioned Defendants.  In support of the same, the Plaintiff states, avers and gives notice

of the following:

### PRELIMINARY STATEMENT

1.        This is a Federal Civil Rights action brought as a result of what the Plaintiff believes

were a blatant violation, inter alia, of his federal civil, constitutional and human rights, when he

Exhibit A

was taken into custody from the interior of his residence by Gulfport Police officer Robert

Thompson, on or about Wednesday. Sept. 8, 20004, and was transported to said

department's station, and thence to the Harrison County Sheriff's Department detention

facility, where he was beaten and tortured so severely that he now has lifelong or

permanent injury.  It is alleged that his rights under certain federal statutes, to include 42

U.S.C.Sections 1983, 1985, and 1986, together with certain rights under the Constitutions

of the United States of America and the State of Mississippi were violated.  Plaintiff files

this action pro se and prays for the relief set forth in the following paragraphs.

### STATEMENT OF THE FACTS

2.      **Early A.M., Wednesday, Sept. 8, 2004**, Plaintiff was put under arrest by a

Gulfport police officer, in his residence, unit # 60, in the Tropical Mobile Home Park

(TMHP), Gulfport, MS, under the facts to follow.  Violation alleged are: **1)** Impeding an

officer in his duty, (questions remains, what impeding and what duty?) and **2 )** Disturbing

the peace ( question remains, whose peace? ).

3.      Plaintiff's contact with the officer (Robert Thompson ) arose from the following

circumstance.  As he was sitting in his reading chair, he had seen the officer talking to a

disturbed man, named Paul Becthtold lll, in the commercial parking lot next to the TMHP.  The

man had just voluntarily removed himself and his myriad luggage from Plaintiff's residence.

He had no home in Mississippi and had been staying in Plaintiff's place while awaiting a

vacancy in the drug rehab program at the Biloxi VA facility.  He first stayed with Plaintiff at

and from a date commencing approximately 2 to 2 ½  weeks earlier.  In reference to the

starting night, Plaintiff's had met him at the local coastal bus system's transit hub.  Paul had

just arrived from New Orleans. He had asked Plaintiff to watch his pile of luggage while he searched for a security officer to report suspicious activity concerning what might be happening to another person, who, like himself was trying to get to the Biloxi VA. Paul and this other person were offered a ride to the VA by a couple of guys in a car, after they got off a Greyhound bus from New Orleans. A taxi driver informed him that those guys were drug dealers, and Paul presented himself as worried about the other guy who accepted the offer of transportation. After Paul could not find an acceptable person to relay his concern, the local bus arrived. Since he had a lot of luggage, about seven or so pieces, to load, Plaintiff assisted him. While in transit, Plaintiff explained to Paul that the bus in which they were riding didn't go to the VA, but that he would need to transfer at the next hub.

4.      As it was both late in the day and there being a waiting time at the next hub transfer, Plaintiff told him that the VA would be closed by the time he got there. There was a bus stop right outside the TMHP, and whether Paul was a fellow vet or not, Plaintiff would have offered overnight accommodations. Plaintiff told him that he could sack overnight at his place and catch the bus in the morning. He did so. Plaintiff also allowed him to store his stuff at his place while he went to check-in or whatever he was doing at the VA. He returned in the afternoon. Apparently he was told by the Biloxi VA to go to the Gulfport VA., where Plaintiff had his own primary care assigned physician. Plaintiff does not know whether Paul ever registered at the Gulfport VA or not. He informed Plaintiff that he wanted to hang around and be ready to take a spot in the drug rehab program offered at the Biloxi VA, when an opening occurred, because his thinking was, "people drop out".

5.      At some period during Paul's stay with Plaintiff, Paul handed Plaintiff a large stack of his medical records and wanted Plaintiff to read them. Plaintiff just sort of fanned though them

and caught the phrase something to the effect of "clinical depression". Plaintiff also noticed that he had been to multiple VA facilities in multiple states. He also informed Plaintiff that he received "Methadone" and "Xanax", 120 and 140 count, via the same mailed to his father in Louisiana. He showed Plaintiff a long orange plastic tube in which he carried the drugs, affixing the tube with a long piece of rawhide to his thigh, covered by his pants. Plaintiff did suspect that Paul might be using the drug or drugs to trade with a "drug dealer", who was located both on the opposite side and end of the park. Said noted self admitted drug dealer was noted to have items appropriated from around the "encampment", and when Paul needed a mattress, he had one very quickly.

6.      **On Friday, September 3**, 2004, Paul informed Plaintiff that he was going to a New Orleans Saints' football game in New Orleans that very night, at the invitation of his father. I believe that it was still morning when he informed me of this coming event and that a friend of his father from Panama City, FL, was coming to pick him up. Paul handed the Plaintiff his cell phone and Plaintiff was instructed to provide directions to the person on the phone as to how to find the TMHB. Plaintiff did so assist, and within 15 to 20 minutes, said friend of Paul's father arrived. He was very well spoken and dressed. We chit chatted for 15 to 20 minutes, during which time he received business calls and accomplished the subject matters efficiently and smoothly. Expecting Paul to return that very night by the transit mode of his father's friend, I instructed him, that if I was not home when he got back, he could find me at unit #21, where I was probably watching TV with Major Taylor,U.S.A.Ret.

7.      **Plaintiff did not see Paul again until** very late in the night of **September 7, 2004.**

Plaintiff returned to his residence very late that night, after his evening watching TV with Major Taylor, and helping the latter gentleman, who is disabled, close down his residence and transfer anything which he needed, bedside.

8.      Upon arriving at his residence, Plaintiff found his home lit up from one end to the other. and music blaring or blasting from same. He found that Paul had returned, after an interval of approximately 105 or more hours, and was inside Plaintiff's home. Needless to say, it was not hard to break into Plaintiff's residence, especially since the sliding glass door had only a bar to prevent it from being opened or fully opened. Plaintiff's habit was to set the door such that it would be ajar just enough to allow his two California cats to enter and exit as they wished. Plaintiff is fairly sure that **Paul either had __no memory__** of Plaintiff's instructions as to how to find him upon his return from the football game, which was expected to be the same day as his departure, **or** concern as to the propriety of just breaking into Plaintiff's home.

9.      Plaintiff entered his home and found Paul very animated. He seem wired up, cranked up, or some such description. At some point, Paul launched into a tirade about his father being so cheap for not having three tickets providing for group sitting. The obvious conjecture would seem that his father and his father's friend had season tickets. Paul related to me that the last sighting he had of his father was as they were entering the Super Dome. He never saw his father again, over the entire time he was gone from my place period. Strange!

10.     From his description of events, it seemed that Paul, upon entering, was distracted by or attracted to New Orleans Saints football souvenirs. He presented to Plaintiff two gifts. One was a small bottle of whiskey, either a ½ pint or a pint, which he handed to Plaintiff and said "this is for you". The other was a poster of the New Orleans Saints. The latter presentation astounded Plaintiff. The Plaintiff, for the entire time that Paul stayed in his home, always had

an extra large red and gold "San Francisco 49ers" sweat shirt, prominently displayed on his very large padded reading chair, as if it was a head or back rest.  It was so noticeable that another tenant of TMHB, upon returning from the adjacent Village Square Shopping Center would callout from a distance "49er"!  The thought strikes one, "Does this guy have his head on tightly?

11.     Over the course of Paul's stay with Plaintiff, Plaintiff was concerned about Paul falling asleep with a lit cigarette.  Numerous times he would just "nod off".  At a time, the night of his return, when Paul had gone back to the master bedroom, Plaintiff had made himself a drink consisting of cold or ice water from a ½ gallon plastic container which he kept in his refrigerator, and then dumped the remainder of the small bottle into said container of ice water, and tossed the bottle into the trash..  At some time in Paul's walking around, he remembered the gift, and asked where the bottle was.  Plaintiff responded that it was gone.  He seemed momentarily perplexed, but eventually sat down, and proceeded to converse with Plaintiff on some subject or another.  Paul was occupying Plaintiff's expensive two-seated foldable chair with a combined center counter and a large hanging compartment, beneath, along with appropriate glass holders on the arms.  Plaintiff could not afford to replace this item of furniture, which was still in new condition.  This piece of furniture was facing the side of Plaintiff's reading chair, which was facing his sliding glass entry door.  At some point in Paul's conversation with Plaintiff, he stopped talking.  Plaintiff turned his head towards Paul and discovered that his eyes were shut while he was holding a lit cigarette!  Plaintiff spoke saying "Paul you can stay one more night, and then we got to have a talk."

12.     Upon awakening and realizing what Plaintiff had said, Paul abruptly arose and stormed back to the master bedroom, in some sort of **silent rage**.  He commenced to start assembling

his stuff.  He had a lot of stuff. (( To portray a glimpse of his non respect of others or lack of consideration, the very first evening after getting off the bus, with Plaintiff helping to carry all his luggage to stay over that first or one night, he pushed Plaintiff's toiletry items aside on the bathroom counter, and laid out his sundry items. Also, to the best of Plaintiff's recollection, during that first "you can sack out at my place and catch the bus in the morning" evening, he had actually unpacked his luggage and placed their contents into Plaintiff built in drawers in the master bedroom! ))

13.    When Paul had all his stuff packed and assembled outside Plaintiff's residence, he transported them to the vacant parking area of the Village Square shopping Center, the same site from which he was viewed later conversing with Officer Thompson. Plaintiff is unaware of the contact event that produced the presence of the Gulfport police officer.  Paul could have made a cell phone call, or the officer could have been on routine patrol on Pass Road and noticed an unusual circumstance, to wit: somebody standing in a vacant parking lot next to a large pile of luggage in the middle of the "night"

14.    After an unknown amount of time, the officer left the conversation he was having with Paul, and stepped through the commercial divider, walking toward Plaintiff's residence.  As he approached Plaintiff's walk way and stairs, Plaintiff arose and slid open his glass door.  The officer wanted to talk to the Plaintiff, and the Plaintiff courteously invited him inside.  He stated that the guy in the parking lot stated that Plaintiff "had punched him in the face". Plaintiff responded that the guy was lying or straight out lying.  He asked Plaintiff for his name and social security number, which Plaintiff quickly provided and repeated same.  Then the officer asked Plaintiff **"What company are you with?"**  Plaintiff was not only shocked that this ungrateful Paul would make such a false accusation, but was doubly shocked and confused

as to the relevance of being asked the latter. Plaintiff had just recently retired on social security upon being stuck in Mississippi with engine trouble with his Trooper ll vehicle.  A top line firm, and you'll be treated with respect?  Should Plaintiff furnish the name or names of his companies which he had never formally closed in California?

**15.**    When Plaintiff responded that he had never heard of such a question asked in an identification setting, and that he had a law background (thus the curiosity) and was it mandatory in Mississippi to provide same. The officer answered in the affirmative while he was busy with his radio.  He certainly showed that he was not happy to be questioned, and actually didn't even seem to allow time for Plaintiff's answer.  He had very quickly traced Plaintiff by name and social security number, and declared: "Oh, your just a drunk, turn around". Plaintiff complied, and was told that he was under arrest, and was immediately handcuffed.  He walked Plaintiff out from his home and to his squad car, which was parked next to the pile of Paul's luggage.

**16.**    While Plaintiff was handcuffed and sitting in the backseat of said car, Officer Thompson, who, by this time, was seated behind the steering wheel, turned around and stated that he didn't like people who lived in "trailer parks" ("Clintonesque") By/At that moment Plaintiff became concerned.  He is reminded of a response which he received from a native Californian, retired from a sensitive branch of the federal establishment, to his disclosure that he was going to Mississippi : "Your going where ? With all those _____?  **A portentous comment to be sure**, not withstanding the twenty first century!

**17.**    Plaintiff requested of the officer that he secure his home.  He walked back to the place, but it seemed that he didn't comply.  Much later when, Plaintiff returned, he found his home unsecured, sliding door was not bared at all.  Additionally he discovered that Paul had illegally

reentered his home, and robbed and destroyed property, including one item, which was especially dear to him, that had belonged to his deceased gal friend. Evidence of such reentry consisted of ticket **stubs** to the New Orleans Saints' game, which he had attended the prior Friday, along with other detritus Paul left on Plaintiff's pet traveler which was used as a table in front of his reading chair. Said items were not there when Plaintiff was unceremoniously removed from his own home.

**18.**     It became apparent that, to Officer Robert Thompson, the Plaintiff was "a person of no merit", and that the officer thought that he could get away with anything, including the placement of false charges! Obviously, a person in Plaintiff's situation would not be happy, yet Plaintiff never expressed any verbal anger. When Plaintiff was seated on a bench at the police station, he was silent when asked where he was born. He thought that if this officer or agency could easily find his D.U.I. record in the 1990's, they could locate his birth city and nationality, a free American citizen, with all rights and privileges appurtenant to same. Thus he sulked for a while, then answered. Plaintiff at no time wised off or became insulting or combative in any manner whatsoever.

**19.**     Shortly thereafter Plaintiff was transferred to the Harrison County Sheriff Dept. Knowing that he had no outside contacts nor a sufficient bank account and no employer to use as a reference, Plaintiff stated to sheriff personnel that he did not plan to "bond out", and that in due course he wanted to be "taken before a magistrate". He was placed in a large dark room, a changing room? The room was illuminated only by light dimly entering from a "pass through" opening.

**20.**     Shortly thereafter, two figures entered. **The much larger** of the two commenced to wrap what seemed like a cloth material around his left fist and started to beat and torture

Plaintiff. Plaintiff was smashed against a wall, sustaining a painful bump on the back of his head, and knocked to the floor **numerous times**. Plaintiff never said anything. Their intent was clear from the first moment, and Plaintiff would not give them any excuse or reaction to be used as a pretext for their obvious mission, **the instilling of fear and damage,** in to and to Plaintiff.

21.     Plaintiff was ordered to get up from the floor numerous times. If he didn't rise quickly enough, various methods were utilized to bring him to his feet.. To wit: he would be grabbed by the hair and yanked to his feet, or hands would be placed around his neck from behind, and brought upright. The most painful method, and the one causing lasting injury, was to grab his right hand and bend the fingers back as far as possible, which elicited from the Plaintiff a blood curdling scream of raw agony. Plaintiff did silently ask himself, after being "beaten to the floor again, why was he trying to get up again, just to be knocked back down, while he was pushing his shoulder up the wall, for leverage, to accomplish it.

22.     After this demonstration of <u>Southern Law & Power</u>, Plaintiff was given a jump suit type garment, which was too small to cover his torso (part of the degrading, weakening and fear routine?), and placed in a cell. ***The memory of that room, that event, and that Terror has never gone away.***

23.     Later that morning, Plaintiff was called out of his cell and informed that he was being released "on his own recognizance". That description was a bold lie, which led to a singular adjunct of the Southern System of Justice. Plaintiff at that moment was in bad shape, it hurt to breath and it hurt to swallow, and his head hurt. He very basically hurt all over. Plaintiff told the deputy sheriff / correction officer who filled out his "release document" that he had been beaten up, and said officer informed Plaintiff that a report of it had already been made. The

medical personnel who was standing at the counter at that very time, was also informed by Plaintiff that he had been injured, specifically mentioning his head.  Said medical personnel turned his own head to the side, and responded **"So?"**

24.    **Plaintiff wonders** at his decision to leave, just get the heck out and away from that **Chamber of Horror.**  Plaintiff had and has a number of law enforcement personnel in his background, who could fit in one of the following categories: acquaintance, friend, classmate, relative (a high ranking officer in a major city being recruited by a national head hunting firm), &/etc., all the way up to homicide captain and beyond. The latter is declared to emphasize that Plaintiff is not the type of person to give any law enforcement personnel a bad time or disrespect.  Even beyond that, he is certainly not stupid enough to do so, especially being in the environs of the South, with its reputation in the rest of America.  Plaintiff queries himself with the thought, "what if he hadn't signed the "release" related form", and chose not to accept that method of egress.  Would he have been brought before a "magistrate' or would something **"have happened to him"?**  If the former, and especially since the issued garment didn't cover his torso and neck fully, the appearance would have allowed a magistrate to witness his beaten condition, but if the latter, <u>what would have occurred?</u>  In the former result, he injuries would be patent, not covered up.  Was that form of release used to bury what happens in that Chamber of Horror?

25.    Plaintiff queries himself as to what **<u>situational circumstance</u>** had he found himself in that could have resulted in the harm that came to him.  The sequence of events started by a false accusation, which the Plaintiff affirmatively branded as "a lie" or a "straight out lie." Plaintiff was never asked by the arresting officer what circumstance did the Plaintiff think might have led to the accusation.  Plaintiff was informed by the arresting officer, Robert

Thompson, in his patrol car, that he didn't like people who lived in "Trailer Parks". Plaintiff

realizes that his speech or the sound of his voice is not that of the locals.

**26.**     Plaintiff knows that at no time commencing from the moment of "meeting" the

Gulfport Police Officer to his release from the Harrison County Adult Detention facility, did he

ever use any **language or gesture** that could in any way or fashion be taken or translated as

disrespect, or as the younger generation describes as "dissing". It seems normal that when an

arresting agency turns over custody of a suspect to another authority, there would be words

said by the first to the latter describing the detainee. Thus, the Plaintiff knowing from the

declaration of Officer Thompson, that said officer held hostile "vibes" or a hostile attitude

towards Plaintiff, and Plaintiff being, so to speak, from the officer's viewpoint, "not one of us",

the question arises, what was transmitted or communicated to the detention facility regarding

the type of person the arrestee was and the description of his state of mind or emotive makeup?

Additionally, as nothing untoward was said or done by Plaintiff upon entering the facility, why

was he directed into a darken room? Why would an officer or officers enter the room? The

"pass through" aperture allowed communication with a detainee, along with the spatial status

to deliver the required jail garb. Did the Central Control Officer know or observe that the two

officers entered the room? Did the person who eventually supplied the jail suit hear the

commotion, and/or the voice of an officer, or the scream of raw agony that emanated from the

Plaintiff? If any human being could be received into a system and start to experience an

unusual procedure or sequence of events, be beaten and tortured, and everybody seems to be

acting like this is business as unusual, <u>SOMETHING IS UNDERSTOOD BY ALL</u>

<u>PARTICIPANTS.</u>

27.    That something is a feeling, a <u>state of consciousness</u>, or <u>collective/group attitude</u> described as to the effect of "We all wear a Badge, &/or, are employed by a Badge, or am the Badge, with all power &/or majesty appurtenant to The Badge. That is a **commonality**. What accompanies that commonality is what is "legislatively" enacted in some fashion by statute, code, memorandum, order/suggestion, and any overt/known routine practice, whether participating in, or known about and not objecting to the same. That accompaniment, or accompanying factor is called a <u>Duty</u>. An obligation of due care, caring and doing no harm or damage to what/who is entrusted to one. The duty exist even if that duty is not official, and is only contractual, or to say, appurtenant to a contract, and even if only that of the duty that goes with citizenship, or even the mere fact of ones humanity. The foregoing is such that it becomes a custom, usage or practice of a group, and by extension those dealing with the group. When the foregoing is <u>commonly participated</u> in, known about, and known about, but not objected to, it is a common understanding, and an agreement, a consensual arrangement, whether by act or default, whether by verbal assent and immediate co-existing act, or sequential/consequential act, or silence, <u>all are conjoined</u> in this arrangement.

28.    The duty starts or exists with the man, or THE MAN, the patrolman, or police officer on the street, or "beat on the street, right on up in authority, equal or otherwise. And in a detainee situation, where one agency transfers a detainee to another agency, and the first agency knows or is charged with knowledge of an existent or possible danger to the detainee they are transferring if the detainee is in the custody of the second agency, the first agency is responsible to the detainee for all harm that befalls that detainee, when said danger is foreseeable by a/the reasonable man's standard attaching to professional law enforcement officers or agencies.

## PARTIES

**29.**     The Plaintiff is a citizen of the United States of America and is a resident of Harrison

County.  The physical and mental injuries inflicted upon and sustained by Plaintiff were done

while he was being held on misdemeanor charges in the Harrison County Adult Detention

Center in Gulfport, MS, while the center was under the supervision and control of the

Defendant, Sheriff George Payne.

**30.**     The Defendant Harrison County, MS, is a political subdivision of the State of

Mississippi and is an entity responsible for the oversight and funding of the Harrison County

Sheriff Department.  The Defendant may be served with process by effecting the same upon

the president of the Board of Supervisors, Ms. Connie Rocko, and /or the Chancery Clerk for

Harrison County, MS. John Mc Adams at Harrison County Courthouse in Gulfport, MS.

**31.**     The Defendant, the Harrison County Sheriff Department, is a political entity or

subdivision organized to provide security and safety to and for the citizens/ residents of

Harrison County, MS.  This Defendant may be served with lawful process by serving Sheriff

George Payne, or his designee, at the Harrison County Courthouse in Gulfport, MS, or at the

Harrison County Adult Detention Center at 10451 Larkin Smith Drive, Gulfport, MS.

**32.**     The Defendant, David Brisolara , is an adult resident citizen of Harrison County, MS.

At all times material hereto, this Defendant is the duly elected Sheriff of Harrison County,

MS,vested with the responsibility and authority to hire, train, supervise, set policies and

procedures ,enforce the policies and procedures adopted or otherwise implemented and to

provide protection to the citizens/residents of Harrison County, MS, which duty or obligation

includes the Plaintiff.  This Defendant is sued in his official and in his individual capacities.

He may be served with lawful process at the Harrison County Courthouse in Gulfport, MS, or at that 10451 Larkin Smith Drive, Gulfport, MS.

33.    The Defendant, George payne, was an adult resident citizen of Harrison County, MS. At all times material hereto, this Defendant is the duly elected Sheriff of Harrison County, MS, vested with the responsibility and authority to hire, train, supervise, set policies and procedures ,enforce the policies and procedures adopted or otherwise implemented and to provide protection to the citizens/residents of Harrison County, MS, which duty or obligation includes the Plaintiff. This Defendant is sued in his official and in his individual capacities.

34.    The Defendant, Major Dianne Gaston-Riley, Director of Correction , is an adult resident citizen of Harrison County, MS. She is sued in her official and in her individual capacities. At all times material hereto, she was employed, Harrison County, MS, Sheriff George Payne, and the Harrison County Sheriff Department. She was directly responsible for overseeing the administration of Harrison County Adult Detention Center, developing, implementing and enforcing policies and procedures regarding the conduct of officers, their training, hiring and firing, the handling and/or processing of persons being detained, and for protecting the rights, privileges and immunities of every person in the custody of the Harrison County Adult Detention Center. She may be served with lawful process at her place of employment, the Harrison County Adult Detention Center 10451 Larkin Smith Drive, Gulfport, MS.

34.    The Defendant, Forman Captain Rick Gaston, Booking Supervisor, was an adult resident citizen of Harrison County, MS. He is sued in his  individual capacities. At all times material hereto he was employed by the Defendants, Harrison County, MS, Sheriff George Payne and the Harrison County Sheriff Department, and he was in charge of devising policies

and procedures regarding the booking process, the handling and/or processing of persons being detained, and/or or processed in booking, supervising the booking personnel, implementing and enforcing policies and procedures and generally overseeing the entire booking process, to include overseeing the training of Deputies and evaluating their continued performance. He may be served with lawful process at his place of employment, if rehired at time of issuance of summons, at the Harrison County Adult Detention Center 10451 Larkin Smith Drive, Gulfport, MS. or in the alternative where he resides or can be located in the State of Mississippi, or wherever approved by the rules, regulations or approved codes or procedures / Law of the State of Mississippi.

**35.**    The Defendant, Captain Phil Taylor, Director of Training for the Harrison County Adult Detention Center, is an adult resident citizen of Harrison County, MS. He is sued in his official and individual capacities. At all times material hereto he was employed by the Defendants, Harrison County, MS, Sheriff George Payne and the Harrison County Sheriff Department and he was in charge of the training provided to the members of the Harrison County Sheriff Department, to include those assigned to the booking department. He may be served with lawful process at his place of employment the Harrison County Adult Detention Center 10451 Larkin Smith Drive, Gulfport, MS.

**36.**    The Defendant, Medical Administrator / Pat Olson employed for the Harrison County Adult Detention Center, is an adult resident citizen of Harrison County, MS.This party is sued in his official and individual capacities. At all times material hereto he was employed by the Defendants, Harrison County, MS, Sheriff George Payne and the Harrison County Sheriff Department to oversee the providing of adequate medical services and was in charge of of ensuring that proper, prompt and professional medical assistance was provided to each person

detained in the custody of the Harrison County Sheriff Department when necessary or the circumstances warranted.  He may be served with lawful process at his place of employment the Harrison County Adult Detention Center 10451 Larkin Smith Drive, Gulfport, MS.

**37.**    The Defendant, Health Assurance LLC was at all times material hereto the contract medical provider retained to provide medical services or assistance to detainees at the Harrison County Adult Detention Center.  This Defendant is a domestic corporate entity with its principal place of business located at 5903 Ridgewood Road Suite 320 Jackson MS 39211.  It may be served with lawful process at the Harrison County Adult Detention Center 10451 Larkin Smith Drive, Gulfport, MS or by effecting service of process upon its registered agent Melvin Priester at 371 Edgewood Terrace Dr Jackson MS 39206

## JURISDICTION

**40.**    The Plaintiff herein invokes the federal question jurisdiction of this Honorable Court pursuant to 28 U.S.C. Section 1331 & 1343 to obtain a judgment  for any costs of suit and damages suffered and sustained by him and caused by the Defendants' blatant violation of the his rights, privileges and immunities, as guaranteed by the Fifth, Eight and Fourteenth Amendments to the Constitution of the United States of America and by the applicable Federal Statues, more particularly , 42 U.S.C. Sections 1983, 1983(3), 1986 & 1988.  Additionally, this Honorable Court has jurisdiction to adjudicate the pendent or supplemental state claims that arose out of the same course of conduct giving rise to the principle claims of the Plaintiff as herein stated.

## VENUE

**41.**    Venue is proper in this jurisdiction and district pursuant to 28 U.S.C. Section 1391(b)

because a substantial part of the real and immediate harm sustained by the Plaintiff occurred in this judicial district and division.

## COUNT 1

**42.**    The Plaintiff hereby incorporates by reference and re-alleges the information set forth in the foregoing paragraphs.

**43.**    At all times material hereto, the Defendants were vested with the state authority and the delegable responsibility and duty of adhering to, complying with and enforcing the laws of the United States of America and the State of Mississippi.  Consequently, while acting under color of state law, the Defendants, commenced to implement a policy, custom, usage or practice wherein Plaintiff's rights, privileges and immunities were violated. . Specifically, the Defendants, jointly and severally, engaged in a course of conduct that resulted in the violation of the Plaintiff's right to the equal protection of the laws of the United States of America, the Fourteenth Amendment to the Constitution of the United States of America and the corresponding provisions of the Constitution of the State of Mississippi, the right to procedural and substantive due process of the law pursuant to the Fifth and Fourteenth Amendments to the Constitution of the United States of America, the right against cruel and unusual punishment pursuant to the Eight Amendment to the Constitution of the United States of America,. The violations complained of in this Complaint include, but are not limited to, the use of excessive force, torture, deprivation of identifiable civil rights, i.e. life, liberty and/or property, the unnecessary and wanton infliction of pain in light of the circumstances confronted by the Defendants resulting in a deprivation that was sufficiently serious wherein the Defendants acted maliciously and sadistically by using force and physical violence designed and intended to cause Plaintiff physical, mental and emotional harm, pain, humiliation and/or injury, and

thereafter, evidence a deliberate indifference to the Plaintiff's notification of his beaten condition. Said condition consisted of painful breathing and swallowing, marked or bruised up torso, neck and head/etc. Notification that was made to and in front of the officer at the counter at the time of release and while standing next to the medical man, met with complete indifference to Plaintiff's severely beaten up and very painful condition. Specifically when notified of the large bump on the back of the plaintiff's head, said medical person turned his head to the side and said **"So"**.

**44.**    As a direct and proximate consequence of the Defendants' actions, Plaintiff was deprived of certain rights, privileges and immunities secured by the Constitution of the United States of America, the laws of this Nation and the State of Mississippi. Plaintiff's Fifth and Fourteenth Amendment rights to procedural and substantive due process and equal protection of the laws were violated by the Defendants, together with his Eight Amendment right proscribing cruel and unusual punishment.

**45.**    The Defendant Sheriff David Brisalara is currently holding the authorization to receive service for the Sherriff's Department.

**46.**    At all times material hereto, the Defendants, former Sheriff George Payne, the Harrison County Sheriff Department, Major Dianne Gaston-Riley, Captain Rick Gaston and their agents, representatives, and employees acted pursuant to the policies, regulations, and decisions officially adopted or promulgated by those persons whose acts may fairly be said to represent official policy of or were pursuant to a governmental custom, usage or practice of the Defendants, Harrison County, MS, , the Harrison County Sheriff Department, and/or Sheriff George Payne

**47.**    .It is further averred that the Defendants former Sheriff George Payne, Major Dianne Gaston-Riley, and Captain Rick Gaston, were the governmental officials whose edicts or acts may fairly be said to represent official policy, practices, custom or regulations of the Defendants Harrison County, MS,, and Harrison County Sheriff Department,  The aforementioned  Defendants collectively and individually developed, planned and implemented the policy, custom and/or usage that resulted in and caused the Plaintiff permanent injury including but not limited to his right hand, his dominant hand, from which he endures pain every day of his life from the permanent nerve damage that resulted from his torture.  That pain is experienced while typing this very document.  Said referred permanency is verified by federal medical personnel.  Plaintiff was hurt, and hurting enough to be cognizant of the need of medical attention, and the reporting of the event or events which led to his condition to a trusted arm of his national government, and did so in an appropriate time frame, soon after the tortuous/criminal event.

**47.**    Additionally, Plaintiff who before his night in the Sheriff's Chamber of Horror never feared any jurisdiction in America.  That is no longer the case, and his former feeling of trust in his own country can never be restored.  That is definitely permanent also. And it is a bloody shame.

**48.**    As a direct and proximate consequence of the Defendants' conduct wherein such Defendants deprived Plaintiff of certain rights guaranteed by the Constitution of the United States of America, Plaintiff, suffered immediate and irreparable harm to his person resulting in degradation, both physical and mental, mental distress and severe emotional anguish.

## COUNT 2.

## ACTION FOR CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

### (42 U.S.C SECTION.1985 )

**49.**     The Plaintiff hereby incorporates by reference and re-alleges the information set forth in the foregoing paragraphs.

**50.**     It is alleged that either **prior** to the time that Plaintiff was delivered into the custody of the Harrison County Sheriff, or at the transfer moment, the Gulfport police officer transferring plaintiff made know his hostility/distain/contempt for Plaintiff to the county personnel.  The essence of said described attitude has many methods of being communicated, silently or verbally, written or not, or by facial or other body language.  The end result would be the same. The motivation could/would stem from the mere temerity of asking `a question, ie. regarding the question of company employment, or the officer harboring bad feelings towards all residents of "trailer parks", or even simply speech uttered without the appropriate southern sound. The result would be a decision to "teach a lesson" or discipline, in their view, "a smart aleck".  At some point an agreement/plan was decided on and two officers entered the dark cavernous Chamber of Horror and beat and tortured Plaintiff.  On information/belief  the Central Control officer stayed at his/her post and observed or knew the two officers unnecessarily entered that room, did or didn't properly surmise their malicious intent, and took no necessary action to intervene.

**51.**     It is further averred there existed at the Harrison County Adult Detention Center a belief, practice, usage and/or custom that it was perfectly fine to beat and/or abuse detainees who may have not presented proper respect to the "badge", in any manner whatsoever, through a mere question or statement as innocuous as expressing a preference to await an appearance before a judge or magistrate!  Furthermore, once those deputies began violating Plaintiff's

constitutional rights by using excessive force, beating, abusing and torturing Plaintiff, no members of Harrison County Sheriff Department or Health Assurance LLP, who did not intervene to stop the beating or to report the same , likewise became co-conspirators, aidors and abettors and/or accomplices to the deprivation of Plaintiff's civil, constitutional and human rights and they are likewise liable for their acts of omissions.

52.    Furthermore, the conspiracy to interfere with Plaintiff's, civil rights manifested itself, or became apparent especially, but not limited to the time plaintiff was called out of the holding cell and informed that "a report of his beating had been made"!  Was that a straight out fiction? Was claimed report verbal only or both verbal and some minimal written memo or notation? Was it said to allay any further communication from Plaintiff to any government employee, Badge holder or not?  Under any circumstance, it would be expected that if "things" were "on the up and up, or the system was operating according as to "law", Plaintiff would have been approached and questioned concerning an "incident" or unusual event.  Nothing in the latter vein occurred.  The transmission of the "information" that a report had been made was a transparent dissemination to cover up the abominable or monstrous conduct of Sheriff employees.

53.    The conspiracy to deprive the Plaintiff of certain federally protected rights, privileges and immunities began with a basic understanding to proceed in an illicit manner of custodial conduct to the very violent treatment of Plaintiff at the hands of Sheriff employees to the concealment of the true state of affairs from Plaintiff upon/at his conditional signing of release papers when told of the alleged report.  It is clear from the facts set forth above that the Defendants willfully and maliciously agreed and conspired to engage in a course of conduct that resulted in a blatant violation of Plaintiff's constitutional rights through their acts of

omission and commission.  As a direct and approximate consequence of the Defendants' action on the date in question, the Plaintiff suffered permanent injuries.  Thus the Defendants are jointly and severally liable to the Plaintiff for the pain, suffering, and injuries, permanent or otherwise.

## COUNT 3

### ACTION FOR NEGLECT OR FAILURE TO PREVENT CONSPIRACY

**54.**    The Plaintiff hereby incorporates by reference and re-alleges the information set forth in the foregoing paragraphs.

**55.**    The Defendants,  former Sheriff George Payne, Director of Corrections Dianne Gaston-Riley,  Booking Supervisors Rick Gaston, and unidentified employees of Health Assurance, LLP, knew or  reasonably should of know prior and during the conduct hurting, and damaging Plaintiff and the implementation of the conspiracy to deprive Plaintiff of his federally protected rights that such activity took placed in the Harrison County Sheriff Department booking area, or any where else in the detention facility.  It is believed and alleged that previous incidents of abuse and allegations of unnecessary use of excessive force were reported by the Harrison County Adult Detention Center to the American Correctional Association when it sought accreditation from the American Correctional Association.

**56.**    However, neither former Sheriff George Payne, Dianne Gaston-Riley, Rich Gaston, the members of Health Assurance, LLP nor anyone else in a position of authority to thwart the conspiracy took any action whatsoever to prevent the same from happening.  Had these Defendants intervened, the great pain, anxiety, degradation and enormous fear and permanent injuries sustained by Plaintiff would not have occurred. But for Defendants failure of Duty, of

taking "due care", Plaintiff would be "whole" today, not left to suffer for the remaining days of his life, with said damages very possibly increasing in severity as age progresses.

57.     The Defendants, former Sheriff George Payne, Director of Corrections Dianne Gaston-Riley, Booking Supervisor Rich Gaston, and unidentified employees of Health Assurance, LLP, in their individual and official capacities, either intentionally or through negligence, failed to expose, prevent or otherwise thwart the conspiracy to deprive the Plaintiff and other persons similarly situated, of the equal protection of the laws of this Nation and State notwithstanding the fact that they possessed the authority, power, and ability to halt, annul, void, expose, intervene in or stop the violations before they occurred.  Consequently, these Defendants are liable for the Plaintiff enormous harm and damages and the deprivations that occurred prior thereto.

**COUNT 4**

**<u>FAILURE TO ADEQUATE TRAIN & SUPERVISE DEPUTIES</u>**

58.     The Plaintiff hereby incorporates by reference and re-alleges the information set forth in the foregoing paragraphs.

59.     The Defendants, Harrison County, MS, Harrison County Sheriff Department, former Sheriff George Payne, Director of Corrections Dianne Gaston-Riley, Booking Supervisor Rich Gaston, and Training Director Phil Taylor, failed to provide adequate and competent training and/or supervision to Defendants Deputies working in and around the booking room on the date in question.  The aforementioned Defendants are and at all times and especially at the time of the inflictions of permanent damage/injuries tasked with the non-delegable duty and responsibility to formulate, oversee and implement official policies, procedures, practices and

customs that were to be carried out at the Harrison County Adult Detention Center by the deputies employed there.

60.    As a direct and proximate results of the aforementioned Defendants' failure to properly develop, implement and otherwise devise a process/policy of adequate police training and/or supervision for its booking room Deputies, Plaintiff was deprived of certain constitutional rights, privileges and immunities which, if properly trained and supervised, every Deputy within the employ of Harrison County Sheriff Department and Sheriff George Payne would have known of the illegality of Defendants' conduct on the date in question and plaintiff horrendous and life-threatening ordeal and injuries and corresponding deprivation of his civil rights, privileges and immunities would not have happened.

61.    Failure to provide adequate training and supervision to the booking room Deputies in question was so grossly negligent that it amounted to a deliberate indifference and blatant disregard for the rights, privileges and immunities of the Plaintiff, and any other person or persons so situated.  Thus, because of the failure to adequately train and supervise the Defendant booking room Deputies, the aforementioned Defendants are liable for any and all grievous fear, pain and suffering experienced before, during the actual multiple inflictions of pounding, grabbing, knocking and or pulling, and current and future life long injuries, and any and all consequential of those same enumerated, and the deprivations of civil rights associated therewith.

## COUNT 5

### NEGLIGENT HIRING, RETENTION AND FAILURE
### TO DISCIPLINE OR TAKE NECESSARY CORRECTIVE ACTION

62.    The  Plaintiff hereby incorporates by reference and re-alleges the information set forth in the foregoing paragraphs.

63.     The Defendants, Harrison County, MS, Harrison County Sheriff Department, former

Sheriff George Payne, Director of Corrections Dianne Gaston-Riley, Booking Supervisor Rich

Gaston, were vested with the authority to hire, fire and discipline employees of the Harrison

County Sheriff Department.  On information and belief the Plaintiff avers that for at least a

period of time consisting in the minimum of about one and one half months to over three and a

half years there had been numerous complaints made of/about incidence of abuse, excessive

use of force, actual physical obvert signs of same and detainees fraught with some mental

distress or injury in various amount of severity and lengths of time, short term or permanent

mental scarring.  The decision by the Defendants Harrison County, MS, Harrison County

Sheriff Department, Sheriff George Payne, Director of Corrections Dianne Gaston-Riley,

Booking Supervisor Rich Gaston, to hire, retain and not discipline these Deputies, thus

allowing encouraging and perpetuating illicit, grossly harmful and life threatening criminal

conduct resulted in the **unavoidable creation** of an extremely hostile environment damaging to

everyone present, not only to the obvious victims, the detainees, but **inextricably also to the**

**deputies themselves,** whether directly participating  or not, by the inuring of the conduct, in

their mental attitude, acceptance of the wrongness as a matter of course, thus coursing all, even

other county employees, and which continued right up to the time of Plaintiff's grave beating

and torture and consequences.  As a direct and proximate consequence of the negligent hiring,

retention and failure to discipline or to take the necessary corrective action in the past, the

aforementioned Defendants are liable for all physical, emotional, mental harm/damage, at the

time, currently and those that have proved permanent and corresponding deprivation of rights

sustained by the Plaintiff.

**COUNT 6**

## PENDENT STATE <u>OR</u> SUPPLEMENTAL CLAIMS

### A. BATTERY

**64.**    The Plaintiff hereby incorporates by reference and re-alleges the information set forth in the foregoing paragraphs.

**65.**    After the Plaintiff was taken into the custody of the Harrison County Adult Detention Center and placed in the aforementioned large dark room, illuminated only by light dimly entering from a "pass through" opening, he was severely beaten, smashed and tortured.  The physical injuries or marks of such treatment were shortly later noted and recorded by federal medical personnel when the Plaintiff was able to get to the Biloxi Veterans Medical Facility in Biloxi Mississippi. The offensive contact was intended to cause harm to Plaintiff and/or to unnecessarily inflict pain and distress upon his body.

**66.**    As a direct and proximate cause of the beating, ie., the offensive contact, the Defendants inflicted upon the Plaintiff, he was injured to such an extent that he has permanent injuries, and in particular, but not limited to, the extreme nerve damage done to his right hand, and the forever memory of that "Chamber of Horror", and its consequences.  Thus the Plaintiff is entitled to a money judgment against  the Defendants, both known and unknown, jointly and severally, who engaged in or contributed to or otherwise facilitated through their acts of omission or commission the illegal beating and torture that was inflicted upon him.

### B. ASSAULT

**67.**    The Plaintiff hereby incorporates by reference and re-alleges the information set forth in the foregoing paragraphs.

**68.**    The events that give rise to this action that occurred on or about Sept. 8, 2004 at the

Harrison County Adult Detention Center created in the Plaintiff a reasonable apprehension that the Defendants acting independently and in concert with another, were going to cause him to suffer or sustain immediate harmful or offensive contact to his person. To wit: placed in a dark room, approached menacingly while a large person is wrapping something around his fist.

69.    As a direct and proximate consequence of the conduct of the aforementioned Defendants, both know and unknown, the Defendants are jointly and severally liable to the Plaintiff for the assault perpetrated upon his person Thus the Plaintiff is entitled to a money judgment against the Defendants who engaged in or otherwise contributed to or otherwise facilitated through their acts of omission or commission the illegal assault that was inflicted upon him.

### C.  Civil Conspiracy

70.    The Plaintiff hereby incorporates by reference and re-alleges the information set forth in the foregoing paragraphs.

71.    On the date in question the Defendants, acting in concert with one another entered into an agreement, expressly or by implication through their joint participation, before, during and after the beating and torture, to engage in a conduct that was wrongful, intentional and wanton and designed to inflict upon the Plaintiff certain harm, suffering and pain that would easily be not only vicious, but also permanent, and in such a manner that he would be reminded of the "Chamber of Horror" for the rest of his life, even when his hand was not even in use.  The Defendants agreement to engage in such conduct was illegal and amounted to a civil conspiracy against the Plaintiff.

72.    As a direct and proximate consequence of the conduct of the aforementioned Defendants, both know and unknown, the Defendants are jointly and severally liable to the

Plaintiff for the conspiracy they knew or reasonably should have known was against the law And public policy when the same manifested itself against the interest of the Plaintiff. Thus the Plaintiff is entitled to a money judgment against the Defendants who engaged in or contributed to or otherwise facilitated through their acts of omission or commission this civil conspiracy against the Plaintiff.

### D. INTENTIONAL INFLICTION OF EMOTION DISTRESS

73.     The Plaintiff hereby incorporates by reference and re-alleges the information set forth in the foregoing paragraphs.

74.     The Defendants conduct was designed to not only inflict physical pain and suffering upon the Plaintiff, but also emotional and mental anguish and distress on the date in question and it absolutely accomplished that to a lifelong extent. The manner, methods and design of the Defendants' conduct caused him enormous emotional and mental distress and anguish. To call a spade a spade, it was Stark Terror in the dark, with seemingly no escape or manner or outlet to notify any decent human being of what was occurring to him.

75.     As a direct and proximate consequence of the terrifying conduct of the aforementioned Defendants, both known and unknown, the Defendants are jointly and severally liable to the Plaintiff for the intentional infliction of emotional distress and mental anguish inflicted upon the Plaintiff. Thus the Plaintiff is entitled to a money judgment against the Defendants who engaged in or contributed to or otherwise facilitated through their acts of omission or commission this absolutely terrifying and outrageous conduct against the Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, THE FOREGOING CONSIDERED, The Plaintiff prays that upon the filing of this complaint that this Honorable Court will set this matter for a full and complete trial on the merits and upon the completion of the same enter a judgment granting the following relief;

a) enter a judgment in favor of the Plaintiff and against the Defendants, jointly and severally, for the actual or compensatory and presumed damages sustained by Plaintiff, pursuant to 42 U.S.C. Sections 1983, 1985, 1986, 1988, the Fifth, Eight and Fourteenth Amendments to the Constitution of the United States of America and for the violations of numerous pendent or supplemental state claims arising out of the same set of acts from which the deprivation of civil, constitutional and human rights arose for the deprivation of such constitutional rights, personal injury to his body as a whole, but especially his dominant hand, and any aggravation of an older, previous injury, sustained in another state, specifically Plaintiff's neck, (relevantly referenced by the injury to the back of his head when Plaintiff was smashed against the wall, and told the detention center's medical personnel about the bump on the back of his head, where upon said gentleman responded with his caring "SO ?") and other parts of his anatomy, infliction of emotional distress, mental anguish, pain suffering, degradation, humiliation, torture, medical, and any other injury or claim that may be discovered during the discovery process for which the LAW holds the Defendants liable and responsible in an amount to be determined by a jury but not less than $ 1,500,100 ;

b) a judgment in favor of the plaintiff and against the Defendants, jointly and severally for punitive or exemplary damages, for the intentionally outrageous, willful, wanton and intentional conduct that resulted in a GROSS or reckless disregard for the welfare, safety,

rights, and privileges or immunities of the Plaintiff, in an amount to be determined by the jury but not less than $ 4,500,000.

c ) a judgment for such relief, general or specifics, as the Court may deem appropriate, just and equitable.

Respectfully submitted, this the _____ day of,