Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JOHN A. ORTLAND,
    Plaintiff,

VERSUS        CIVIL ACTION NO: 1:07cv1075LG-RHW

SHERIFF BRISOLARA, FORMER
SHERIFF GEORGE H. PAYNE, JR.,
MAJOR DIANNE GASTON-RILEY,
CAPTAIN PHIL TAYLOR, ET AL.,
    Defendants.

DEPOSITION OF JOHN A. ORTLAND
(APPEARING PRO SE)

Taken at the offices of Dukes, Dukes,
Keating & Faneca, P.A., 2909 13th
Street, Sixth Floor, Gulfport,
Mississippi, on Friday, October 23,
2009, beginning at 10:27 a.m.

REPORTED BY:

    F. Dusty Burdine, CSR No. 1171
     Simpson Burdine & Migues
      Post Office Box 4134
     Biloxi, Mississippi  39535
      dusty@sbmreporting.com
        (228) 388-3130



EXHIBIT "B"

Simpson Burdine & Migues 228.388.3130
sbm@sbmreporting.com

47447f00-784c-43bc-9dbd-8990d25caee5

1   guy is handling his business calls, boom, boom,
2   boom, and they take off.  I had told him, if I'm
3   not here when you get back, I'll be at Unit 21,
4   and that's Major Taylor's place.  I watch TV with
5   him, etcetera.
6       Q.   Okay.
7       A.   Okay.  What was the rest of the
8   question?
9       Q.   We're trying to get back to what
10  happened on the night of the incident.
11      A.   Yeah, okay.  So he comes back down, and
12  then he sits in that double chair.  And he's
13  talking and talking.  And then I turn my head.
14  He's nodding off asleep again.  I saw him do that
15  before with a lit cigarette.  And I said, Paul,
16  you can stay another night, but we're going to
17  have to have a talk.  He just rose up.  He was
18  alert, didn't say a thing, walked back to the end
19  of the trailer, starts throwing all of his stuff
20  together and is leaving.
21      Q.   Okay.  About what time was that?
22      A.   Sometime -- it had to be post midnight.
23  I wasn't keeping a diary or anything?
24      Q.   Was it 1:00, 2:00?
25      A.   It was within an hour, for sure.

1  at least wreck that chair at that time.
2      Q.   So after he went back to his room and
3  started packing, what happened?
4      A.   When I realized he's not saying anything
5  to me, he just -- I -- when I turned my head and
6  saw him like that, I says, Paul, and he starts to
7  wake.  I said, stay another night, but we're going
8  to have to have a talk.  That's when he just got
9  up, went back to the bedroom.  The first clue,
10 when I said he could sack overnight, he went into
11 the bathroom, got all his toiletries out and
12 pushed my stuff to the side.  That should have
13 been a clue.
14     Q.   Okay. So after he started packing, when
15 did the Gulfport Police Department arrive?
16     A.   I don't know.  I was sitting there
17 smoking, enjoying that ice with some type of cheap
18 bourbon, whatever it was, and I see him standing
19 over there in the Village Square Parking lot with
20 his pile of luggage.  I look back there again, all
21 of a sudden, there's a police officer there and
22 they're talking and talking and talking.
23     Q.   Okay.  Did he call the police?
24     A.   Well, that's what I don't know, but he
25 bragged that he had four cell phones and all that.

1  I don't know if he did or not or if it was just a
2  patrolman going by and wondering why a guy is
3  standing in the parking lot in the early morning
4  hours with a pile of luggage.
5      Q.   So they were speaking to Mr. Becthtold?
6      A.   They were conversing. All of a sudden,
7  the police officer -- not all of a sudden. I
8  don't know how long they talked. When I looked
9  over there, hmm, interesting. The officer
10 proceeded towards the trailer park -- or mobile
11 home park was the term. Stepped to the little
12 entrance of bars they had there to separate
13 Village Square from the other property, and he's
14 coming right to my door. Okay.
15          So I open up the door, and I invited him
16 in. But what he reported, he said he never was
17 able to enter the residence. That's a total lie,
18 but that's okay. Proceed. Okay. So he says,
19 that guy over there said you punched him in the
20 face. I either said, he's lying or he's straight
21 out lying.
22          Well, he says, what's your name and
23 social security number. And I gave it to him and
24 then repeated same. But I asked him a question --
25 one of the things he asked was, who do you work

1    Q.   All right.  Did the officer go back and
2  secure what you thought he was --
3    A.   He went back there.
4    Q.   But he didn't apparently do that?
5    A.   How could I see?  I'm in the back of the
6  squad car.
7    Q.   So he came back to the vehicle after a
8  period of time; is that correct?
9    A.   Yes.
10   Q.   All right.  And then what happened after
11 that?  Did you go to booking?
12   A.   I was taken to the police station.
13   Q.   To which police station?
14   A.   Gulfport police station, and I'm sitting
15 there.
16   Q.   Okay.  Had you been drinking that night?
17   A.   I just told you I had the one drink.
18   Q.   Just the one drink?
19   A.   That's right.
20   Q.   You didn't have any drinks prior to
21 midnight?
22   A.   Bill doesn't even drink.
23   Q.   Okay.  So you had one whiskey drink?
24   A.   Yes.
25   Q.   And now you've been transported to the

1   incident on September 8, 2004?
2        A.   I have no recall of ever buying a
3   12-pack then.  I couldn't afford it.  I got $119
4   for food, for electricity.  In fact, I only use
5   the air conditioner for a day and a half to get my
6   cats acclimated to it, then I shut it off because
7   I have no idea what it cost to do that.
8        Q.   But on this night, you did not have but
9   that one drink?
10       A.   Exactly.
11       Q.   All right.  So now we're back in
12  booking, and you had been processed, presumably?
13       A.   Yeah, but don't ask me the time.
14       Q.   Sure, I understand.  So then the
15  incident that's the subject of this lawsuit
16  occurred.  And where did that occur?
17       A.   I don't know what they call the room,
18  but it's probably the dressing room.
19       Q.   So you were going in to get dressed?
20       A.   I don't know what I was going for.  I
21  was told to go in there.  All of a sudden, two
22  figures emerged.
23       Q.   So you were in this room by yourself?
24       A.   Yes.
25       Q.   And then two figures, are they

1  correctional officers?
2      A.  How would I know that?
3      Q.  Well, were they wearing uniforms?
4      A.  They were dressed.
5      Q.  Did they have street clothes?
6      A.  The only light entering that big room
7  was coming through a pass-through.
8      Q.  Okay.  So you don't know who these
9  people were?
10     A.  I can see the left side of a face, but
11 while -- I mean, it happened so quickly.  I see
12 this guy wrapping some type of material around his
13 left fist.  And then all of a sudden, explosions
14 started hitting -- started happening.
15     Q.  What do you mean?
16     A.  Knocked down, hit against the -- bumped
17 against the wall.  That's where I -- I told the
18 guy, I got a bump behind the head.  Apparently
19 that's the employee of the Health Assurance.  And
20 he just put his head to the side and said, so.
21     Q.  Okay. So you don't know who they were?
22 They were not wearing uniforms, you couldn't see,
23 it was dark; is that correct?
24     A.  You know, I'm not even thinking of how
25 they're dressed or their uniforms.  Well, I'm sure

1   they weren't burglars there.
2       Q.   But you don't recall seeing them wearing
3   uniforms?
4       A.   It happened so quickly that --
5       Q.   Is that a yes or a no?  Do you recall
6   them wearing uniforms?
7       A.   What would a uniform look like?
8       Q.   Not street clothes.  Yes or no?  You
9   don't know?
10      A.   No, I don't know.  I mean, it happened
11  so bloody quickly.
12      Q.   Okay.  So you don't know if they were
13  employees of the Harrison County Adult Detention
14  Center?
15      A.   Ghees, I didn't ask for identification,
16  no.  Why don't we sign this quick -- I have
17  nothing to prove yet.  I mean, I have nothing
18  until I can maybe do some motions.  And it's
19  pretty darn late.
20      Q.   So you were beat up by these two
21  figures, whoever they were?
22      A.   No.  There were two figures.  Only one
23  did the beating.  The other guy just stood in the
24  background and watched.  And it was Ryan Teel, you
25  can bet your bottom dollar on it.

1  didn't see the person who did it, somebody threw
2  an orange jump suit.  Gosh darn, I should have
3  written all this down.  And it was too small to
4  really cover me, but I put it on.
5      Q.   They put it on or you --
6      A.   I put it on myself.  I never saw even
7  who put it there at that counter.
8      Q.   Are you still in the room when they --
9      A.   Yes.
10     Q.   Okay.  And so you're testifying that a
11 jump suit appeared in the room somehow?
12     A.   Yes.
13     Q.   And then you put it on?
14     A.   Was I ordered to remove my clothes?
15 Gosh darn-it.  I can't even tell you when I
16 disrobed, straight out.
17     Q.   Okay.  You were clothed at the time the
18 incident occurred, though; is that correct?
19     A.   In some fashion, yes, of course, I was.
20     Q.   Okay.  So then after it occurred, then
21 you apparently changed into the jump suit?
22     A.   Yes.
23     Q.   Okay.  And then after you changed into
24 the jump suit, what happened?
25     A.   Well, I know I'm hurting.

1   tired.
2       Q.   Okay.  So you think you fell asleep
3   during that period of time?
4       A.   I more than likely nodded off.
5   Sometimes I do that for a minute, and I hear a
6   noise, my head raised.
7       Q.   And then sometime later --
8       A.   My name was called to come out.  Nobody
9   came to the cell.  They called my name out and
10  said, we're going to release you on your own
11  recognizance, which wasn't quite true, but that's
12  okay.
13      Q.   So after they told you that, did they
14  give you your clothes back or what happened?
15      A.   Yeah.  I got my clothes back.
16      Q.   You got your clothes back, changed, and
17  then you left?
18      A.   When I was at that counter, I told --
19  you call it a deputy.  A correctional officer, I
20  guess, is the proper term.  I says, I was beat or
21  beat up.  He told me a report has already been
22  made.  Now, there's a guy there.  Obviously, he
23  was a medical-type tech.  I used to be a medic
24  specialist with Walter Reed.  This guy -- and I
25  said -- whatever that type of smock he had on or

1    Q.   Okay.  But as it relates to the incident
2  at the jail, is there any other details?
3    A.   No.  Just how I exited and I saw this
4  couple getting up to leave.
5    Q.   All right.  Now, do you have any
6  personal knowledge or do you even allege that
7  George Payne was involved in this?
8    A.   No.  I don't even know the names of
9  anything.
10   Q.   What about Dianne Gaston-Riley, was she
11 there?
12   A.   I don't know.  I mean --
13   Q.   How about Phil Taylor?
14   A.   No.  I wouldn't even know the name or
15 what he would look like.
16   Q.   Sheriff Brisolara, was he there?
17   A.   Of course, not.  He didn't become
18 sheriff until later.
19   Q.   So all of these, you either don't know
20 or they were not present or participated in this
21 incident in any manner whatsoever; is that
22 correct?
23   A.   Well, you say in any manner whatsoever.
24   Q.   Physically.
25   A.   Physically, of course, not.

1    A.   But originally, I had to meet that --
2  and Bill Pate told me -- but he's got on his wall,
3  admitted to the federal bar.  And he said, John,
4  I'm not capable of handling it.
5    Q.   And Bill Pate is an attorney here in
6  Gulfport?
7    A.   Been many -- yeah.  He also told me when
8  I missed that date about the next court.  I said,
9  you know nolo contendere.  He says, it's been
10 known to happen.  You've got to reschedule.
11   Q.   All right.  I'm going to go through your
12 complaint.  In Count I, it looks like you're
13 alleging a policy and custom at the jail.  I want
14 to know --
15   A.   I lost all the information I was
16 collecting on the computer.  It crashed.  I took
17 it to an Air Force expert.  He was just ready to
18 redeploy, and he couldn't resurrect all the
19 information I had on that computer because I was
20 putting a lot of stuff on it.
21   Q.   Well, let's do this, in your own words,
22 in Count I, regarding implementing a policy,
23 custom and uses of practice, what are your claims
24 against George Payne in that regard?
25   A.   Only he was the person where the buck

1  Q. Okay. But as far as the sheriff and all
2  these individuals, are you alleging, based on what
3  happened to you in the room, you're holding them
4  accountable for what their employees did; is that
5  correct?
6  A. I think that sums it up pretty well.
7  Q. Okay. Now, do you allege that your
8  rights were violated due to an official policy,
9  practice or custom?
10  A. Certainly not official. I mean, come
11  on.
12  Q. So there was no official policy. How
13  about a custom?
14  A. Well, that seemed to be true.
15  Q. Okay. And what do you mean, that seems
16  to be true?
17  A. Well, as I said, I was collecting
18  information. When Jessie got killed -- or I'll
19  say murdered, it came out in the paper that
20  Robin -- whatever her last name is. It's been
21  established it had been going on 18 months. Whoa,
22  okay. I can raise my head. Then it came out
23  later that it went back five years, the whole
24  practice of what was going on.
25  Q. Okay. But do you have any --

1    A.   And, you know, that really shocks me.  I
2 know there was one woman who went to some superior
3 officer and reported it, if you don't stop him,
4 he's going to kill somebody.  Now, can you really
5 believe, if it went on for five years, nobody knew
6 anything?
7    Q.   So this is based upon the public reports
8 that you found in the newspaper?
9    A.   Yes.  I had never been in that building
10 before, so how would I know?  What's my source of
11 information?  And like I said, I lost it all when
12 the computer crashed.
13    Q.   So you base the custom on what you saw
14 in the newspapers and the news, generally?
15    A.   Well, I don't think the task force and
16 all that, but, yeah.  Personally, of course not.
17    Q.   Okay.  And so you have no personal
18 knowledge of specific customs that were being
19 conducted?
20    A.   Just what happened to me.  That's the
21 only personal knowledge I can have.
22    Q.   Okay.  Count II, you allege that there
23 was a conspiracy to interfere with your civil
24 rights.  Do you have any personal knowledge of who
25 was involved in the conspiracy?

1   Q.   Okay.  But I'm referring to your case
2 right now.
3   A.   And I know it.
4   Q.   All right.  So you have no personal
5 knowledge of who was negligently hired?
6   A.   Of course not.
7   Q.   Okay.  How about a retention and failure
8 to discipline or take corrective action?
9   A.   Personal knowledge?
10   Q.   Yes.
11   A.   No.
12   Q.   Okay.  Then I believe in Count VI, the
13 Court has already dismissed your pendent state law
14 claims, so --
15   A.   Wait, wait.  What?
16   Q.   By order of the Court, your state law
17 claims were dismissed for the statute of
18 limitations.
19   A.   Wait, wait.  What are you referring to?
20 I don't know what you're referring to there.
21   Q.   In Count VI of your complaint, the Court
22 has previously dismissed --
23   A.   Let me see that.
24   Q.   Well, this is just your complaint.  I
25 don't have the order in front of me.

1       Here it is.  This is Document 32, and
2  it's a memorandum opinion and order granting in
3  part and denying in part --
4       A.   Can I see that, please?
5            (Witness examining document.)
6       Q.   We can move on.  I'll let you take a
7  look at it and make a copy of it for you
8  afterwards.
9       A.   Just hold on a minute.
10 MR. TINER:
11           Okay.  Let's go off the record.
12           (Off the record.)
13 MR. TINER:
14      Q.   All right.  Mr. Ortland, back to Counts
15 I, Count II, Count III, Count IV and Count V of
16 your complaint, I know we've gone over personal
17 knowledge.  Besides your testimony here today, do
18 you have any facts which support the claims made
19 in those counts?
20      A.   Repeat that.
21      Q.   We've already gone over Counts I through
22 V in your complaint, correct?
23      A.   Yes.
24      Q.   Okay.  And I asked you if you had any
25 personal knowledge regarding those claims.  And we

1  already went over each of those, but I'm asking
2  you do you have any facts which support the
3  allegations in those counts besides your testimony
4  here today?
5      A.  Just my knowledge that I lost.  If there
6  was a fact to prove -- didn't I tell you I already
7  sent a letter with return receipt to Warden
8  Cabana.  In fact, he was sitting right next to me
9  in the back row.  And then I went out for a
10 cigarette when there was a break and I came back
11 and I found -- it was probably Jessie's
12 representative standing at the door.  And there
13 was a sign going across, do not enter courtroom,
14 because I wanted to hear Cabana's testimony, do
15 not enter the court while on witness stand.
16     Q.  All right.  But besides your testimony
17 here today, you have no other facts?
18     A.  Exactly.
19     Q.  Okay. Thank you. Now, in your
20 complaint, I think you're asking for -- your
21 prayer for relief looks to be $1,500,000 --
22     A.  Oh, that's just -- I should have left it
23 like I did, whatever the Court deems.
24     Q.  Just whatever the Court --
25     A.  I was just copying what other attorneys

1   A.   Yes.
2   Q.   Okay.  Now, we talked a little bit
3  earlier about what was injured.  You said your
4  right hand was injured?
5   A.   That's the lasting.  Everything else
6  is -- I'm breathing.  It's fine.
7   Q.   Okay.  Well, what else was injured?
8   A.   There were marks all over me.
9   Q.   But where specifically?
10  A.   Well, the nurse reported it here.
11  Q.   Where is "here"?
12  A.   I sent them to you.
13  Q.   Well, you're pointing to your right
14  back?
15  A.   I think what I noticed there was a mark
16  there, the torso, chest.
17  Q.   Hold on.  She can't take down "there."
18  I'm just trying to show where the injury was.  To
19  your right back, is that where you were pointing
20  just a moment ago?
21  A.   I think it was noted I had markings on
22  my hip.
23  Q.   Okay.  That's your right hip?
24  A.   Yes.  Because the nurse and the doctor
25  were reporting different things, but the progress

1  sitting on my bed, that right hand just jumped
2  like an electric shock went through it, like that.
3  Twice in a row.  I said, son of a gun.
4       Q.    Whenever you say it had been over three
5  years, what are you referring to?
6       A.    When I was beaten and tortured.
7       Q.    Okay.  So three years afterwards, it's
8  jumped?
9       A.    Yeah.  Also, I got now -- Bill Taylor,
10 the gentleman I live with, had fallen -- he's kind
11 of disabled -- on the front porch.  And he had
12 broken some bones in his hands, one or more.  So I
13 took him over to Keesler Hospital, you know, in
14 the wheelchair and all of that.  But Bill said, I
15 think he's an old MASH doctor because he was in
16 the Army and he transferred to the Air Force.
17           Anyway, while he's treating Bill about
18 his hand, I asked about nerve injuries.  I think I
19 described it something like, I had these fingers
20 bent back and it was "X" period of time.  He said,
21 nerves take a long time to heal.  Well, heck, now
22 it's -- it's still right now.
23      Q.    But you weren't being treated?
24      A.    No, no, no.  But I asked an opinion
25 because there's a guy who's working on Bill's

1   hand.
2       Q.   But whoever was working on your friend
3   never examined you; is that correct?
4       A.   Oh, no, no, no.  But I just wanted to
5   get an answer from him.  And he said it takes a
6   long time.
7       Q.   Well, let's get back to this.  You saw a
8   doctor at the VA two days after the incident.
9   When was the next time related to these injuries?
10      A.   I know I came back the following week
11  because that thing was really swollen up.
12      Q.   Now, you said you had gotten an x-ray.
13  Were any other tests performed on that first
14  visit?
15      A.   No.  In fact, the x-ray wasn't -- I
16  don't think that was the x-ray taken on the first
17  visit -- or ordered it the next day.  Restate that
18  question.
19      Q.   Okay.  You had first testified that two
20  days after the incident, you had gone to be seen
21  about --
22      A.   I was -- it was the old VA in Gulfport,
23  right across from the beach.
24      Q.   Okay.  But you said you --
25      A.   I felt strong enough to get on my bike