General Order #10
**Harrison County Sheriff's Department**
January 3, 2000

George Payne, Jr, Sheriff

## WEAPONS & USE OF FORCE

1. **SCOPE**

   This policy is directed to all sworn personnel.

2. **PURPOSE**

   The purpose of this policy is to establish guidelines for sworn and
   reserve personnel regarding the use of force. This policy will also
   establish training criteria for both lethal and non-lethal use of force
   options.

3. **POLICY STATEMENT**

   The Harrison County Sheriff's Department recognizes and respects
   the value and special integrity of each human life. In vesting deputies
   with the lawful authority to use force to protect the public welfare, a
   careful balancing of all human interest is required. Therefore, it is the
   policy of this Department that deputies will use only that force that is
   necessary to bring an incident under control effectively while protecting
   the life of the deputy or another.

   All sworn personnel will be provided with a precise departmental policy
   that establishes guidelines, proscriptions, and limitations on the use of
   force generally and the use of force in particular. Additionally, deputies
   will be trained in the appropriate and proficient use of force and the
   use of control and management of firearms and other non-lethal weapons.

4. **USE OF FORCE THEORY**

   The ability to use force is one of the most basic factors that distinguish
   deputies from the rest of society. Because of this responsibility, the use
   of force is under constant scrutiny by the public and the courts.

General Order #10—January 3, 2000

EXHIBIT

"D-6"

1

There are six (6) categories of force options that are available for deputies as a defensive tactic. They are:

A.  Dialogue for talking an individual into compliance with a lawful request to avoid a physical confrontation.

B.  Escort Techniques are a means of providing a low level, non-threatening and nonviolent compliance procedure used to remove an individual from an area that may present danger to the deputy or the subject.

C.  Pain Compliance involves the manipulation of a joint to cause pain. It is generally used in circumstances in which an escort is inappropriate or ineffective and yet a higher use of force level is not yet justified.

D.  Mechanical Control (a punch, kick, or throw) has a higher degree of compliance; however, it also has a higher potential for injury to the subject. It is only appropriate when the preceding levels of force have been ineffective as a means of control.

E.  Impact Weapon (ASP TACTICAL BATON & PR-24) is an intermediate level of force that bridges the gap between the use of hands and fists and the use of deadly force.

F.  Deadly Force (firearms) is used as a final option when all other means have been unsuccessful.

5.  **DEADLY FORCE**

A.  Deadly Force Defined - Deadly force is any use of force that is likely to cause death or serious bodily injury.

B.  When May Deadly Force Be Used - Before using a firearm, a deputy will identify himself and state the intent to shoot, where feasible.

C.  Deputies are authorized to fire their weapons to:

1.  Protect himself or others from what is reasonably believed to be an immediate threat of death or serious bodily harm; or,

2.  Prevent the escape of a fleeing felon whom the deputy has probable cause to believe will pose a significant threat to human life should escape occur.

General Order #10—January 3, 2000                                    2

D.  Deadly force will not be intentionally used to maim or partially disable a person.

E.  Firearms will not be used as instruments of investigation. <u>The brandishing of a firearm is prohibited, as is the wearing of a sidearm in plain view in public by non-uniformed deputies, whether on or off duty, except at crime scenes or in emergencies.</u>

F.  Administrative Action

Where a deputy's use of force causes death, the Sheriff will determine, on a case by case basis, whether the deputy will be placed on administrative leave until all internal investigative requirements are met. The deputy will be required to undergo an evaluation by a mental health professional before return to normal duties.

G.  Firearms may also be used:

To kill dangerous animals or to kill animals so badly injured that humanity requires its release from further suffering.

To give an alarm or call for assistance <u>when no other means is available</u>.

H.  Additional Restrictions –Deputies will adhere to the following restrictions when their weapon is exhibited:

1.  Except for maintenance or during training, Sheriff's Deputies will not draw or exhibit their firearm unless circumstances create reasonable cause to believe that it may be necessary to use the weapon in conformance with this policy.

2.  ~~Warning shots are prohibited.~~

3.  ~~Deputies will not fire their weapons at or from a moving vehicle~~ unless there is an immediate threat of death or serious bodily injury to the deputy or other persons.

4.  Firearms will not be discharged when it appears likely that an innocent person may be injured.

General Order #10—January 3, 2000                                    3

I.    **Animal Control Deputies – Animal Control Deputies of the Harrison County Sheriff's Department are exempt from the certain sections of this firearm policy and will follow the procedures as directed by the Sheriff or his designate.**

In the event a deputy is called upon to destroy an animal, in a *non-emergency* situation, the deputy should request assistance from the on-duty animal control deputy. If the animal control deputy is unavailable, the deputy may continue with the humanitarian destruction of the animal. If the animal control deputy is on the scene, the deputy should relinquish control of the call to animal control and the destruction of the animal will be the responsibility of animal control. The animal control deputy's judgement shall be weighed heavily before any decision to destroy the animal.

*Deputies are expected to use their best judgement and good common sense when forced to destroy an animal that is obviously vicious or an immediate threat to the deputy or other citizens.*

J.    **Restricted Acts –** *Horseplay and unsafe acts with weapons are strictly prohibited.* **When weapons are handed from one deputy to another for examination or inspection, they will be unloaded and have the cylinder or slide locked open. Shotguns will be transferred from one person to another with the action open and rifles will have the bolt back or action open.**

6.    **ISSUANCE OF FIREARMS**

A.    **Department Issued Weapons**

The *Glock 22 safety-action semiautomatic pistol* will be issued to each deputy to be used in his official duty. At the time of the issuance, the serial number will be placed and maintained in a file kept by the Property Officer. The deputy will accept full responsibility for the care of the weapon. Two (2) additional ammunition clips will be provided for each deputy. Each deputy will keep the additional clips loaded and immediately available for use.

B.    **Department Issued Leather Holsters**

Besides the Glock 22 Safety Action pistol, the Department will issue each deputy a leather safety holster specifically designed for the weapon. The holster will be worn by all uniformed deputies while on duty. Deputies assigned to the Detective Division will be issued a holster designed for their particular needs.

C. **Personal Holsters / Nylon Duty Gear**

Deputies who choose to wear nylon duty gear or Reserve deputies who purchase their own leather duty gear must select a holster that provides for a reasonable amount of security to prevent the weapon from accidentally falling out or to prevent its removal by a suspect. Any deputy using a holster that is not department issued must have the holster submitted to the Firearms committee for review before its use.

Upon separation from the department all deputies will surrender to the Property Officer all weapons, ammunition and related equipment previously issued to him.

7. **NON-ISSUED DUTY WEAPONS**

A. **Full-Time / Part-Time Sworn Deputies**

All deputies will be required to carry the Department issued firearm while on duty. Any deputy who wants to carry any weapon, other than department issued, must adhere to the following guidelines:

1. **Number of Rounds**

The deputy will be restricted to a revolver capable of chambering at least six (6) .38 caliber rounds or a semiautomatic double action pistol capable of chambering at least (7) seven 9mm, 380 caliber, forty caliber or forty-five caliber rounds unless assigned to special detail.

2. **Weapon Brands**

Colt, Smith & Wesson, Dan Wesson, Ruger, Beretta, Sig-Sauer or Safety-action Glock are acceptable.

3. **Barrel Lengths**

The weapon must have a barrel length between four (4) and six (6) inches.

4. **Approval of Weapons**

A "Weapons Authorization Form" must be completed and submitted. The Weapons Authorization Form requires approval by:

   a. **Department Armorer**
   b. **NRA Certified Firearms Instructor**
   c. **Firearms Committee Chairman**
   d. **Sheriff**

B. **Qualifications**

Deputies will qualify with off-duty weapons quarterly during announced qualifications. The deputy must qualify with a minimum score of 75% with the weapon.

C. **Investigative Division Personnel**

Deputies assigned to the Investigative Division may carry weapons with less than a four-inch barrel after submitting a written request, and Weapons Authorization Form as outlined within this policy.

D. **Reserve Deputies**

1. **Number of Rounds**

Reserve Deputies of the Harrison County Sheriff's Department, while on duty, will be restricted to a revolver capable of chambering at least six (6) .38 caliber rounds or a semiautomatic double action pistol capable of chambering at least (7) seven 9mm, 380 caliber, forty caliber or forty-five caliber rounds.

2. **Weapon Brands**

The Reserve Deputy may carry personal weapons fitting into this category manufactured by either Colt, Smith & Wesson, Dan Wesson, Ruger, Beretta, Sig-Sauer or Safety-Action Glock which have a barrel length of between four (4) and six (6) inches. The weapon must be approved in the same manner as outlined within this policy.

3. **Qualifications**

Reserve deputies will qualify with off duty weapons quarterly during announced qualifications. Reserve Deputies must qualify with a minimum score of 75%.

4. **Quarterly Qualifications**

Reserve deputies wishing to carry a semiautomatic, double action pistol capable of chambering at least (7) seven 9mm, forty caliber, or forty-five caliber rounds must qualify with regular deputies quarterly.

General Order #10—January 3, 2000                                    6

E.  **Request To Carry Personally Owned Weapon**

Any deputy employed by the Harrison County Sheriff's Department wanting to carry a handgun other than those issued by the Harrison County Sheriff's Department must submit, in writing, a request to the Sheriff and the Firearms Committee Chairman. A "Weapons Authorization Form" must accompany the letter.

The Firearms Committee Chairman shall review the request to ensure that it complies with the policy. The deputy's letter of request and the Weapons Authorization Form either approving or disapproving the request will be sent to the Sheriff. If the request does not comply with established policy, the Firearm's Committee Chairman will attach a memo to the request explaining the reason for denying the deputy's request.

F.  **Off-Duty / Back-up Weapons**

Backup guns or off-duty guns must be approved by the Sheriff. All requests to carry off-duty or back-up weapons will be handled in the manner as outlined within this policy.

8.  **CARRYING OF FIREARMS**

A.  **Deputies Required to be Armed at all Times**

All on-duty sworn personnel will have a weapon or weapons on their persons at all times. Although certain hours are designated as off-duty, deputies in the performances of their police duties are subject to take police action anytime and should have available his official identification and a firearm at all times. This section shall apply to both regular and reserve deputies of the Harrison County Sheriff's Department. Sworn, on-duty deputies will have a clearly articulable reason for not being armed.

B.  **Exceptions**

On-duty deputies will be armed at all times with very few exceptions. These exceptions may include court appearances, entering onto certain Federal jurisdictions, entering into the jail section of the Harrison County Sheriff's Department, the psychiatric ward of Memorial Hospital & the locked ward of the Transitional Learning Center (TLC). In these and other circumstances, the deputy will be expected to use discretion, good judgement and above all, common sense.

General Order #10—January 3, 2000                                      7

9. **AMMUNITION**

All ammunition carried by deputies of the Harrison County Sheriff's Department and Reserves, whether department issued or individually purchased, will be factory loaded of the anti-personnel design, i.e., hollow point. All special purpose ammunition such as armor piercing, etc. may be carried by the deputy *as standby ammunition only*. The Firearms Committee Chairman must approve all ammunition, other than department issued, before being carried. The carrying of target type ammunition, such as wad-cutters and solid lead round nose bullets, is *STRICTLY* prohibited.

Every sworn deputy will be issued 120 rounds of ammunition at the time the weapon is issued. Sixty (60) rounds will be used for the initial qualification. The remaining 60 rounds will be kept by the deputy for duty purposes. Deputies will be given sixty (60) rounds of new ammunition once a year. The old ammunition will be used during the qualification.

10. **SHOTGUNS, RIFLES AND SPECIAL PURPOSE WEAPONS**

Weapons falling into the above category, whether department issued or privately owned, must be approved and qualified with before being carried. The Firearms Committee must also approve all modifications to these weapons. While being carried on duty, these weapons, when not in use, must be secured within the vehicle.

A. **Authorized Weapons**

All weapons fitting into this category must be manufactured by Colt, Ruger, Beretta, SpringField Armory, Eagle Arms, H & K, Remington, Daewoo, Bushmaster or Galile.

B. **Authorized Calibers**

The following calibers are approved:

223, 9mm, and 7.62 mm x 39

C. **Weapons Approval**

All requests to carry the above-described weapons must be submitted on a Weapon Authorization Form along with *written justification* for the request. The committee will consider no weapons unless it falls within the above guidelines.

**D. Shotguns**

Shotgun ammunition will be factory loaded of the "*00 buckshot*" or "*slug*" category in a size approved by the Firearms Committee. Special purpose ammunition, such as barricade penetrating tear gas rounds, may be carried in reserve. Deputies who carry weapons in the above category must use good judgement and common sense when using these weapons. The potential for harm to bystanders is greatly increased by their use. Only *EXTREME* situations would warrant the use of the above-described weapons; i.e., barricaded armed suspects, tactical situations, etc.

## 11. TRAINING AND INSPECTION

Firearms will not be issued or carried by any deputy until the Sheriff and firearms training deputies are assured of the deputy's ability to handle and fire the weapon with safety and proficiency.

All full-time and part-time sworn deputies will be required to participate in an approved semiautomatic transition course before being issued the Glock 21 Safety-Action pistol. After the initial certification with the weapons, all personnel, except administrative and staff personnel, will be required to participate in firearms training monthly. All personnel including administrative and staff personnel will be required to qualify quarterly using the N.R.A. Distinguished expert course on a date and time designated.

Administrative personnel are those deputies who work from 8:00 a.m. to 5:00 p.m., Monday through Friday and perform administrative duties as designated by the Sheriff.

**A. Qualifications**

The Firearms Training Center O.I.C. shall coordinate all monthly & quarterly qualifications. The O.I.C. will schedule training classes for tactical and close quarter confrontations, shotgun training, rifle training and mandatory NRA firearm qualifications. The dates & times of each qualification will be coordinated through the O.I.C. of Training & Planning and announced to all designated personnel.

**B. Reserve Qualification**

Reserve Deputies will qualify three (3) times per year. Reserve Deputies failing to qualify will be required to retest with a Certified NRA Instructor until the minimum score is attained before returning to duty. The retesting is not necessarily required to be done on the same day as the regularly scheduled qualifications.

C.  **Firearms Committee Meeting**

The Firearms Committee Chairman will call a meeting of all firearms instructors on the Wednesday preceding the quarterly qualifications.

D.  **Firearms Inspections**

The firearms training deputy will inspect each individual deputy's weapons and related equipment during the firearm's qualification session. In addition the deputy may be required to produce his weapons for inspection at anytime by any supervisory person or a department designated firearms instructor.

12.  **PR-24 & ASP TACTICAL BATON**

The ASP PR-24 Tactical Batons are used to give deputies an inconspicuous but effective defensive police impact weapon for use in non-lethal situations. Both impact weapons are authorized for use by sworn personnel following basic certification; however, the ASP Tactical baton is the only Department issued impact weapon.

A.  **Issuance of ASP Tactical Baton**

Upon completion of the ASP Basic Certification Program, all deputies will be issued one (1) ASP Tactical Baton and ASP Scabbard that shall be issued by the Property Oeputy. Upon issuance, all deputies, while in uniform, will be required to carry the ASP Tactical Baton.

B.  **ASP Basic Certification Training**

~~All deputies issued an ASP Tactical Baton will be required to~~ complete a four- (4) hour basic certification course before carrying ~~the ASP Tactical Baton.~~ This program is designed to provide efficient defensive weapon tactics for law enforcement personnel. Deputies of the Harrison County Sheriff's Department who have completed an instructor certification course shall teach the basic training. The ASP Tactical Baton is a non-lethal defensive weapon allowed for use by sworn deputies to provide a force option between hands and fists and the use of deadly force.

Deputies must maintain control at all times. Every technique must be evaluated as for its likelihood of gaining control as compared with its likelihood of causing harm to the subject. Deputies must maintain a high degree of control so that if a higher force option is needed, the deputy is prepared for the situation. When evaluating a technique, the most important consideration is deputy safety. This involves his or her ability to disengage or escalate a response to any given situation. Any technique that does not allow the deputy to escalate the force option in response to a subject's threats is unacceptable.

C.   Maintenance

The ASP Tactical Baton should be maintained on the same manner as your firearm. Batons should be kept dry. Due to the exposure to salty air, water and perspiration, the baton should be periodically opened and dried with a soft cloth. The butt cap, or plug, should be checked to make sure it is screwed tightly onto the handle. The tip should be checked for looseness. If the tip breaks loose, Loc-Tite should be applied to the threads to secure it to the end section. The baton should be periodically checked for hairline fractures or excessive wear between the sections. Fractures may occur if the baton is continually opened with too much force.

D.   ASP Tactical Baton Operation

Holding the handle and snapping the wrist activates the ASP Tactical baton. This action causes the blade to extend. The sudden snap of the wrist locks the shaft into place. To close the baton, the tip must be struck sharply and directly into a nongiving surface. When closed, the retaining spring in the handle holds the blade, preventing accidental extension.

The force necessary to open the baton may be adjusted using the retaining spring inside the handle. Extending the sides of the spring outward will increase the force necessary to open the baton. Pushing the sides of the spring together will lessen the force needed to extend the baton.

E.   Carrying the ASP Tactical Baton

Every deputy will carry the ASP Tactical Baton while in uniform. It may be carried on either the reaction side or the weapon side of the body. It will be carried in the closed mode, tip down. As with firearms, horseplay and unsafe acts with the ASP Tactical Baton are strictly prohibited. The ASP Tactical Baton will not be used as an instrument of investigation.

F.    **Weapon Disarming**

The ASP disarming technique is designed to deal with non-aggressive assailants effectively. It is not intended for deputies to use the ASP Tactical Baton to disarm an aggressive armed assailant. The ASP Tactical Baton should only be used when a deputy believes that the use of deadly force is not justified and the deputy believes that using the ASP Tactical Baton may successfully disarm the subject.

G.    **Use of Force Documentation**

Proper documentation is essential in avoiding potential liability. Any time a firearm or ASP Tactical Baton is used; the deputy will be responsible for completely documenting the circumstances surrounding their usage.

While reports may vary from deputy to deputy in form, the following details should be included in every report:

1.    The type of call that first brought the deputy in contact with the subject.

2.    The number of persons involved in the situation.

3.    The time of day and physical setting of the call.

4.    What the subject said to the deputy.

5.    The subjects general demeanor and attitude.

6.    What the deputy said to the subject.

7.    The subjects actions and reactions and those of the deputy.

8.    A detailed report of all injuries sustained by the deputy and the subject, including photographs, if possible.

9.    The names, addresses, and phone numbers of all neutral witnesses not involved in the confrontation.

In addition to the above information, deputies will complete a *Use of Force Report* and attach it to the incident paperwork. A copy will be forwarded to the Director of Operations and the Sheriff. Deputies will as soon as practical, report all uses of firearms and the ASP Tactical Baton to his or her immediate supervisor.

13. **PEPPER AEROSOL RESTRAINT SPRAY**

The Harrison County Sheriff's Department will issue OC aerosol restraint spray to give deputies additional use-of-force options for gaining compliance or resistant of aggressive individuals in arrest and other enforcement situations. It is the policy of the Harrison County Sheriff's Department that deputies use OC when warranted, but only according to the guidelines and procedures set forth in this policy.

A. Authorization

1. Only deputies who have completed the prescribed course of instruction on the use of OC are authorized to carry the device.

2. Deputies who have successfully completed the prescribed course of instruction and whose normal duties or assignments may require them to make arrests or supervise arrests shall be required to carry departmentally authorized OC while on duty.

3. Uniformed deputies shall carry only departmentally authorized canisters in the prescribed manner on the duty belt. Non-uniformed deputies may carry OC in alternative devices as authorized by the department

B. Usage Criterion

OC spray is considered a use of force and shall be employed in a manner consistent with the department's use-of-force policy. OC is a force option following verbal compliance tactics on the use-of-force continuum.

OC may be used when:

1. Verbal dialogue has failed to bring about the subject's compliance, and

2. The subject has signaled his intention to resist the deputy's efforts to make the arrest actively.

Whenever practical and reasonable, deputies should issue a verbal warning before using OC against a suspect. A deputy may use deadly force to protect him from the use or threatened use of OC when the deputy reasonably believes that deadly force will be used against him if he becomes incapacitated.  Once a suspect is incapacitated or restrained, use of OC is no longer justified.

**C.   Usage Procedures**

1.   Whenever possible, deputies should be upwind from the suspect before using OC and should avoid entering the spray area.

2.   Deputies should maintain a safe distance from the suspect of between two and ten feet.

3.   A single spray burst of between one and three seconds should be directed at the suspect's eyes, nose and mouth. Additional burst(s) may be used if the initial or subsequent burst proves ineffective.

4.   Use of OC should be avoided, if possible, under conditions where it may affect innocent bystanders.

**D.   Effects of OC and Deputy Response**

1.   Within several seconds of being sprayed by OC, a suspect will normally display symptoms of temporary blindness, have difficulty breathing, burning sensation in the throat, nausea, lung pain and/or impaired thought processes.

2.   The effects of OC vary among individuals. Therefore, all suspects shall be handcuffed as soon as possible after being sprayed. Deputies should also be prepared to employ other means to control the suspect to include, if necessary, other force options consistent with agency policy, provided he does not respond sufficiently to the spray and cannot otherwise be subdued.

3.   Immediately after spraying a suspect, deputies shall be alert to any indications that the individual needs medical care. This includes, but is not necessarily limited to, breathing difficulties, gagging, profuse sweating and loss of consciousness. Upon observing these or other medical problems or if the suspect requests medical assistance, the deputy shall immediately summon emergency medical aid.

4.   Suspects that have been sprayed shall be monitored continuously for indications of medical problems and shall not be left alone while in police custody.

5.   Deputies should provide assurance to suspects who have been sprayed that the effects are temporary and encourage them to relax.

6. Air will normally begin reducing the effects of OC spray within 15 minutes of exposure. However, once the suspect has been restrained, deputies shall help him by rinsing and drying the exposed area.

7. Assistance shall be offered to any individuals accidentally exposed to OC spray and feel the effects of the agent. All such incidents shall be reported as soon as possible to the deputy's immediate supervisor and shall be detailed in an incident report.

E. Reporting Procedures

1. Accidental discharges and intentional uses of OC spray against an individual in an enforcement capacity shall be reported to the deputy's immediate supervisor as soon as possible.

2. A detailed narrative report shall be completed following all discharge of OC spray except during testing, training, malfunction or accidental discharge.

F. Replacement

1. Assigned personnel shall maintain all OC spray devices in an operational and charged state. Requested replacements for damaged, inoperable or empty devices are the responsibility of deputies to whom they are issued.

2. Replacements of OC spray canisters shall occur when the unit is less than half full, as determined by weighing the canister.

3. OC canisters shall be inspected and weighed at the firing range during firearm qualifications. The appropriate agency authority shall maintain a record of this fact.

4. Unexplained depletion of OC canisters shall require an investigation and written report by the deputy's supervisor to the Director of Operations.

14. SPIT NETS

The SPIT Net manufactured by Eagle Gear, is the authorized expectorant shield used by the Harrison County Sheriff's Department for violent, in-custody subjects who are either spitting at law enforcement personnel or who are violent and bleeding from the mouth or head area. The SPIT Net is considered a form of restraint. It prevents a prisoner, in a safe and humane manner, from projecting body fluids onto police personnel. The SPIT Net is made from nylon mesh and is large enough to fit over the head & tied in the back. It is designed to allow unrestricted breathing & prevent body fluids from contacting the deputy.

The following operational guidelines will become effective immediately:

A.  Purpose – The SPIT Net is a biohazard barrier designed to reduce the risk of exposure to:

   1.  HIV (Aids)

   2.  Hepatitis

   3.  Tuberculosis

   4.  Highly dangerous disease pathogens

B.  The SPIT Net also acts as a safe deterrent against:

   5.  Biting;

   6.  Spitting;

   7.  And other aggressive behaviors without impairing the deputy's ability to monitor the suspect's physical condition at all time.

C.  General Guidelines

   1.  The SPIT Net installation illustration shows the proper method of attaching the SPIT Net to a suspect.

   2.  THE SPIT NET WILL NEVER BE TIED AROUND THE SUSPECT'S NECK FOR ANY REASON.

   3.  If the SPIT Net cannot be properly secured as shown in the illustration, it will not be used. The SPIT Net may be used any time a suspect demonstrates to the deputy any aggressive behavior or symptoms of any of the above described conditions.

   4.  Anytime the SPIT Net is used, deputy's will continually monitor the suspect to ensure that it does not become entangled around the suspect's neck or become a hazard to the suspect's safety in any way.

   At no time will the prisoner be left alone and unmonitored.

   5.  The SPIT NET is to be discarded after use and is not to be reused for any reason.

   6.  The use of the SPIT Net will be documented in the deputy's arrest or narrative report describing the circumstances for its use.

   7.   The SPIT Net will be removed from the prisoner as soon as it is believed to be safe or as directed by a supervisor

General Order #10—January 3, 2000                                    16

## 15. TRAINING COURSES

The handgun certification course will be based upon the *NRA Distinguished Expert Qualification Course*. Certification with the shotgun will be made using the *NRA Police Shotgun Qualifications Course*. This course includes 5 rounds of rifled slugs and 5 rounds of *00 buckshot*, using the International Association of Law Enforcement Firearms Instructors (IALEFI–Q) target.

The deputy will be required to attain a minimum score of 75% for pistols. A minimum score of 80% will be required for rifles. Seventy-five (75) percent is the current minimum standard for police pistol qualifications as determined by the National Rifle Association. The failure to reach this level of proficiency will require the deputy to return to the range with a firearms training deputy until the minimum score can be obtained. If the deputy evidently cannot qualify within a reasonable length of time, the firearm's instructor shall notify the Sheriff and the Firearms Committee for further action.

Training Documentation - All training and certification must be documented and forwarded to the Training Deputy for filing.

## 16. CARE AND MAINTENANCE

All deputies are required to maintain their firearms properly. The Fire arms Committee prohibits alterations except those specifically authorized, in writing. The department will pay any repairs to department issued weapons, which are due to normal, wear or an unavoidable accident. All repairs of department issued weapons that are the result of abuse, negligence, or lack of care by the deputy will be the financial responsibility of the deputy. Damage to personal weapons through normal wear is the responsibility of the deputy. The department, however, will repair damage to personally owned weapons sustained due to faulty practice ammunition.

The property officer is responsible for maintaining all department weapons that have not been issued to a deputy.

## 17. QUALIFICATION COURSES

| STAGE | DIST. | POSITION | #RDS | TIME |
|-------|-------|----------|------|------|
| 1 | 25 yrds | Kneeling/standing 6 rounds kneeling with barricade, 12 rounds with barricade (Shooters choice of positions) | 18 | 75 second |
| 2 | 15 yrds | Stage 1:  Kneeling/Standing 12 rounds in 25 seconds (6 kneeling & 6 standing) | 18 | 25 second |
| 3 | 7 yrds | Standing/Unsupported | 12 | 20 second |
| 4 | 3 yrds | Standing (Ready gun Position) one hand only! | 12 | 20 second |

**NRA**
**Police Shotgun Qualification Course**

---

**RIFLED SLUGS**

(1)  **50 yards**  —  **1 round, standing from shoulder**

**Time limit**  —  **10 seconds**

**40 yards**  —  **2 rounds, 1 standing from shoulder, 1 kneeling**

**Time limit**  —  **15 seconds**

**25 yards**  —  **2 rounds, 1 kneeling, 1 standing from shoulder**

**Time limit**  —  **15 seconds**

---

**00 BUCKSHOT**

(2)  **\*25 yards**  —  **3 rounds, 1 standing from shoulder, 2 kneeling**

**Time limit**  —  **20 seconds**

**15 yards**  —  **2 rounds, 1 standing from shoulder, 1 kneeling**

**Time limit**  —  **20 seconds**

**\*25 yards only . . . Magazine loaded, safety on, chamber empty**

---

**Scoring**

**Rifled Slugs: IALEFI-Q Target, Each hit within the inner ring – 2 points, any hit within the second ring – 1 point.  All other hits are scored as a miss.**

**00 Buckshot (9 or 12 pellets):  No other load is allowed! IALEFI-Q Target, any hit in the black – 2 points for 9 pellets; 1.5 points for 12 pellets.**

## MINI – 14 RIFLE COURSE

**STAGE 1:**

    **Ten rounds in one (1) minute from the kneeling position**

**STAGE 2:**

    **Ten rounds in one (1) minute from the sitting position**

**STAGE 3:**

    **Ten rounds in one (1) minute from the prone position**

**STAGE 4:**

    **Start with two (2) magazines, each loaded with 5 rounds.  Fire 5 rounds standing, unsupported, change magazines, and fire 5 rounds from the prone position.  (one (1) minute time limit).**

**STAGE 5:**

    **Start with two (2) magazines, each loaded with 5 rounds.  Fire 5 rounds standing, unsupported, change magazines, and fire 5 rounds from the prone position. (one (1) minute time limit).**

**All firing is done from the 50 yard line using the IALEF-Q target.**

**SCORING**

    · **A hit in the X, 10 or 9 ring counts 2 points each:**

    · **A hit in the 8 ring counts 1 point each**

    · **Any other hit on the target counts as a miss**

    · **Fifty shots are fired……….Total possible score is 100**

**General Order #10—January 3, 2000**                                                 **20**

## NIGHT FIRING

### 20 rounds – 100 points

**100 YARD LINE**
    Prone                        **5 rounds on call**
    No Time Limit

**50 YARD LINE**
    1. Prone                 **5 Rounds w/magazine change**
    3 seconds

    2. Stand to Kneel      **5 rounds on call**
    No Time Limit

**25 YARD LINE**
1. Standing Ready         **3 rounds on call**
    No Time Limit

2. Stand to Kneel        **2 rounds w/magazine change**
    No Time Limit

### A SCORE OF 80% IS REQUIRED TO PASS BOTH COURSES

16. **SHOOTING REVIEW BOARD**

    A. **When Required**

        When a deputy, either on or off duty, discharges a firearm (except during qualifying or target practice), a written report shall be submitted within 24 hours to the deputy's immediate supervisor. The report shall explain the circumstances and reasons surrounding the discharge as outlined in this policy.

    B. **Actions Required**

        The Shooting Review Board will be convened to review all facts and circumstances surrounding the events of the discharge of the weapon in the event of property damage, bodily injury or death and in all enforcement actions. This board shall, at the end of its inspection, submit a written report to the Sheriff listing the following:

        1. A synopsis of the incident.

        2. Conclusion as to whether the deputy followed or deviated from department regulations.

        3. Any recommendations to the Sheriff concerning the incident.

    C. **Shooting Review Board Personnel**

        The Shooting Review Board shall be composed of the following personnel:

1.  The Firearms Committee chairman and two (2) members of the Firearms Committee.

2.  The Sheriff or his designees.

D.  **Administrative Investigations**

The Harrison County District Attorney's Office shall be responsible for conducting an independent investigation of all shootings involving deputies of the Harrison County Sheriff's Department. The Sheriff may request other independent investigations by the Mississippi Highway Safety Patrol. HCSD Professional Standards Division will investigate all other incidents not involving discharge of firearms.

17.  **FIREARMS COMMITTEE**

A.  The Firearms Committee will consist of the following personnel:

1.  Firearms Chairman – Must be an NRA certified instructor and must be elected by other NRA certified firearms instructors. This is a voluntary position and the deputy selected will hold the position for one-year (July to July).

2.  Firearms Instructors – Six instructors are required for the committee. All must be NRA certified.

**CONCLUSION**

This policy is for departmental use only and is not intended for use in any criminal or civil proceeding. The department policy should not be construed as a creation of higher legal standards of safety or care in an evidentiary sense with respect to third party claims. Violations of this policy will only form the basis for departmental administrative sanctions.

The Harrison County Sheriff's Department recognizes that extreme or unusual circumstances may occur that would cause a deputy to deviate from this policy. Deputies are frequently required to make immediate judgement calls that may not comply with the use of force policy. In the event that a deputy must take an action that does not comply with this policy, the deputy will fully articulate & justify, in writing, the reasons for his or her actions. In all cases, the Department will fully review the incident to determine if there was sufficient justification for the deputy's actions.

*Harrison County Adult Detention Center*
*Policy & Procedures Directives*



## HEALTH CARE SERVICES

| EXHIBIT |
|---|
| tabbies® "D-7" |

**POLICY:**  All inmates incarcerated in the Harrison County Adult Detention Center will have access to medical, dental and mental health services as needed to maintain basic health.

**PROCEDURE:**

## I.  GENERAL INFORMATION

Medical Care at the Detention Center is a contracted services with NAPH-CARE.

The Medical Staff are available on-site 24 hours per day, seven days a week.

The Medical Staff will deliver services as order by the contracted Physician.

Emergency treatment is available at the direction of Medical Staff.

The Health Service Administrator will submit monthly statistical reports to the Support Services Captain indicating the number of inmates receiving services.

There is a $5.00 fee for each physician, dentist and mental health visit.  Inmates WILL NOT be denied medical services because of an inability to pay.

It is the inmate's responsibility to request non-emergency medical services by completing a Medical Request Form and leaving it in Medical's box.

Medical staff will collect medical request forms daily and schedule inmates as soon as possible.

Corrections Officers must contact medical immediately if there is a medical emergency.

Health Evaluations will be performed by the medical personnel within 14 days of incarceration, FREE OF CHARGE.

If a requested medical procedure is not deemed a necessity by the doctor it will not be provided.

Staff members of the facility will not take deliberate action designed to block, deny or delay access of an inmate to health care services.

Any time an inmate declines medical services, the refusal will be logged and filed as part of the inmate's permanent record.

_Riley_____          _01/01/01_____
Facility Administrator                          Effective Date

General Order #65
Harrison County Sheriff's Department
October 1, 2002

George Payne, Jr, Sheriff

## PROFESSIONAL STANDARDS UNIT

1. **PURPOSE**

   The purpose of this order is to establish the policy for managing and staffing the Professional Standards Unit of the Harrison County Sheriff's Department. This policy will outline the procedures for investigating complaints of misconduct.

2. **SCOPE**

   This policy is directed to all department personnel.

3. **POLICY**

   The Harrison County Sheriff's Department Professional Standards Unit shall be responsible for conducting internal administrative investigations and applicant background development.

   This policy shall define the methods of investigation and discipline in order to ensure the protection of employees' rights through the conscientious investigation and ultimate disposition of each inquiry. This policy shall ensure the integrity of the department by establishing procedures that provide an investigation of any matter that might affect the efficient, professional operation of the department, and mandated compliance with all general orders.

   A. **Internal Investigations Authority**

   Internal inquiries and investigations are performed under the authority of the Sheriff. The Professional Standards Unit shall have the primary responsibility of investigating complaints of alleged employee misconduct. The Professional Standards Unit will operate under the supervision and direction of the Sheriff. All orders written or verbal issued in connection with any internal investigation shall be considered as direct orders from the Sheriff. The final authority to exonerate, declare unfounded, not sustained, or to sustain any complaint rests solely with the Sheriff. Internal inquiries are administrative and should not be construed as criminal investigations.

General Order #65 - October 1, 2002                                                    1

EXHIBIT

"D-8"

**B.  Disciplinary Review**

Members of the Professional Standards Unit may be required to attend  Disciplinary Review Hearings subsequent to internal investigations. The sole purpose will be to provide the facts and circumstances surrounding the respective cases.

**C.  Civil Service Meetings**

A representative of the Professional Standards Unit may be requested to attend regular or special civil service meetings for providing insight on disciplinary actions occurring inside the department.  The representative's responsibility is solely to inform the Civil Service Commissioners of results of particular investigations.

**D.  PSU Area of Investigative Responsibility**

The Professional Standards Unit will investigate serious or sensitive allegations of misconduct and incidents resulting in actual or potential litigation against the county, the Sheriff's Department or employees of the Sheriff's Department. Any such investigation shall be performed under the guidelines of appropriate county policies and Mississippi Statutes.

## Legal Action

The Professional Standards Unit may investigate any pending legal action against the department or it's employees. Upon receipt of such information, a case file will be established which will contain all pertinent information on the action and any request for information.

**E.  Shift Supervisor Area of Responsibility**

The appropriate immediate supervisor will investigate complaints of less serious violations. This assignment shall not relieve the Professional Standards Unit from lending assistance when requested or monitoring the investigation.

The Supervisor receiving an external complaint or filing an internal complaint is responsible for preserving evidence to include taking documentary photographs when practical and possible. The Supervisor shall take photographs of complainants in all excessive force complaints even if injuries are not visibly present.

General Order #65 - October  1, 2002                                    2

### F. Complaints:

***All external complaints will be documented on a Citizen Complaint Form.***
Complaints may be received in a variety of ways including, but not
limited to: (a) in person (b) by mail (c) telephone (d) email (e) third party
*Anonymous complaints are investigated, but have limitations caused by the
inaccessibility of the complainant.*

### Procedure for Citizen Inquiry

A citizen alleging misconduct on the part of any employee shall be
directed to the supervisor on duty regardless of the time of day. The
supervisor may be able to resolve the complaint without the assistance
of the Professional Standards Unit. Many complaints of alleged
misconduct can be handled by the Shift Commander or a supervisor,
provided it is done in a professional and timely manner. Unless the
complaint involves gross misconduct or a criminal violation, the Shift
Commander or supervisor should make every attempt to resolve the
matter without involving the Professional Standards Unit.

If the shift supervisor cannot resolve the complaint satisfactorily or there
is an allegation of a criminal nature, the shift supervisor shall complete
the Citizen Complaint Report and forward this form to the Professional
Standards Unit without delay.

In the event a citizen directly contacts the Professional Standards Unit
when initially registering the complaint, the Professional Standards Unit
will be responsible for referring the complaint to the affected supervisor
or completing the Citizen's Complaint Report and other necessary
documentation.

### Traffic Citations/ Arrests

Complaints relative to differences of opinion between an officer and a
citizen over the issuance of a traffic citation or regarding guilt or
innocence subsequent to an arrest, shall not be investigated by the
Professional Standards Unit, but will be properly handled by the judicial
system.

### G. Use of Citizen Complaint Report

1. Personnel receiving the complaint shall have the citizen sign the
   Citizen Complaint Report in their presence. The substance of the
   complaint shall be documented in the appropriate section of this form.

General Order #65 - October 1, 2002                                    3

2. Under no circumstances shall the Citizen Complaint Report be used as a means to threaten, intimidate, harass or discourage a citizen from making a complaint.

3. Should the citizen refuse to sign the complaint report, the receiving supervisor shall complete the report and document the refusal to sign. A memorandum concerning the allegations shall also be made. The report shall be signed in the space provided for supervisor receiving the complaint. The completed report shall be forwarded to the Professional Standards Unit without delay.

H. Internal Complaint Procedure

In furtherance of the intent of this policy, any employee may submit a written statement, documenting employee misconduct, directly to the Professional Standards Unit which shall process the complaint in accordance with this general order.

I. Written Counseling Form

Written Counseling Forms shall be utilized to document an employee's unsatisfactory performance or to document an incident involving employees. Written Counseling Forms in some cases shall serve as a written consultation. A copy of all the internal complaints or incidents shall be forwarded to the Professional Standards Unit.

If the supervisor believes the complaint, either external or internal, is of such a serious nature that it requires immediate attention, or he needs assistance, he shall contact the Sheriff or the appropriate Director within his chain of command, who shall determine if the complaint requires immediate assistance or the assignment of personnel from the Professional Standards Unit. If the appropriate Director deems that the complaint should be investigated by the Professional Standards Unit, the Director shall make the request to the Sheriff.

J. Initial Investigation Procedures

1. Upon receipt of the documentation and approval of the Sheriff, the Professional Standards Unit shall determine which general order(s), policies or statutes were violated.

2. Should a formal investigation be ordered, an *Initial Notice of Inquiry Report* shall be drafted and forwarded to the affected employee through the chain of command, except under the following circumstances:

   (a) The alleged violation is ongoing.
   (b) The investigation possibly would be compromised by the release of the information.

General Order #65 - October 1, 2002                                                     4

3. Garrity warnings shall be given to employees and signed prior to all formal interviews whereby the possibility of criminal conduct may be alleged. When there is no criminal conduct alleged, employees interviewed by the Professional Standards Unit will be advised of the authority of the investigation as well as requirements of complete truthfulness and candor. This will be documented on an audio recording tape.

K. **Classification of Allegations**

The Professional Standards Unit investigator shall, in the Internal Investigative Report, recommend 1 of the following 5 classifications:

1. Unfounded- the allegation is false or not factual.

2. Exonerated- the incident occurred, but was lawful and proper.

3. Not Sustained- there was insufficient evidence to prove or disprove the allegation.

4. Sustained- the allegation is supported by a preponderance of evidence to justify a reasonable conclusion that the incident did occur.

5. Policy Failure- the policy was not specific or did not cover this incident.

L. **Internal Investigations**

1. Internal Complaints will be assigned an IA# by the Professional Standards Unit OIC.

2. The complaint will then be assigned to a Professional Standards Unit Investigator by the OIC.

Each internal investigative report will contain:

1. The general order(s) violated.

2. The details in chronological order, addressing each point of accusation.

3. A synopsis of each witness statement.

4. Mitigating circumstances, if appropriate.

5. Recommended classification of the allegations

M. **Case File Preparation:**

*Unless special circumstances occur, all internal investigations must be completed within thirty days. An extension may be given by the Professional Standards Unit OIC or the Sheriff.*

Each case file and report will contain the site or copies of the general orders violated. In addition, each case file will include letters and memos relevant to the investigation. All reports must include an investigator's finding and conclusions. Findings and conclusions should be a summary listing of relevant conclusions drawn by the investigator based on facts and circumstances of the investigation and a recommended classification of the allegations shall be provided by the Investigator. The Professional Standards Unit shall not make any recommendations regarding disciplinary action. All Garrity statements, including audio or video tapes of such interviews, must be filed separately from the investigative file in an envelope marked "Garrity statement" and filed accordingly.

N. Dispositions

   1. Informal Personnel Actions- Actions documented on a Written Counseling Form shall be processed by forwarding a copy of the Written Counseling Form to the Professional Standards Unit for record.

   2. Formal Discipline- A copy of the Formal Discipline Report, (letter of suspension, termination, etc.) shall be maintained in the affected employee's personnel file as defined in the department General Orders and a copy to be maintained in the Professional Standards Unit file.

O. Corrective Actions

   1. Informal Personnel Action- When practical informal actions should be positive and educational rather than punitive in nature. The employee's immediate supervisor will complete all informal personnel actions.

   2. Formal Discipline- Construed to be punitive in nature. It includes, but shall not be limited to:

      (a) Written Reprimand
      (b) Demotion
      (c) Suspension
      (d) Termination

P. Procedural Due Process

   1. Prior to awarding any level of informal personnel action or formal discipline, the recommending authority may contact the Professional Standards Unit in order to determine the record of the offending employee and the consistent level of personnel action or discipline for the violation.

General Order #65 - October 1, 2002                                    6

2. **Required Actions-** The following steps will be taken to ensure due process:

    (a) The employee must be informed of the charge(s) against him/her.

    (b) The employee must be given an explanation of the evidence underlying the charge(s).

    (c) The employee must have the opportunity to respond to the charge(s).

    (d) All notices and hearings must be done in a meaningful time and a meaningful fashion.

If the internal investigation classifies the case as either exonerated, not sustained, unfounded or policy failure, the employee(s) involved will receive a letter of disposition.

Q. **Reviews, Appeals and Grievances**

All appeals and grievances shall follow procedures herein and established by the Harrison County Civil Service Commission and Department Policy. The Sheriff and all Division OIC personnel may review all informal and formal personnel actions.

**Obstruction of Internal Investigation**

No employee shall by writing, speaking, utterance or any other means commit an act which would hinder or obstruct an authorized internal investigation by the Harrison County Sheriff's Department.

**Confidentiality of Investigations**

All complaints and complaint investigations will be confidential and will not be discussed within or outside the department without approval of the Sheriff or his designee.

**Unauthorized Internal Investigation**

No employee shall initiate, conduct, or otherwise participate in any unauthorized investigation.

**Other Administrative Investigations**

**Officer Involved Shootings**

The Harrison County District Attorney's Office shall be responsible for conducting an independent investigation of all shootings involving officers of the Harrison County Sheriff's Department. The Sheriff may request other independent investigations by the Mississippi Highway Safety Patrol or other law enforcement agencies. The Harrison County Sheriff's Department Professional Standards Unit will conduct all internal investigations.

General Order #65 - October 1, 2002          7

## Background Investigations

Background investigations of applicants including sworn, non-sworn and reserves, will be conducted by the Professional Standards Unit. A background investigation by the Professional Standards Unit may be requested by any Director when the Director is informed of a need to begin the hiring process of applicants. The PSU investigator will be given a checklist of needed information, and the items on the list will be noted as to time and date of completion. Upon completion of the investigation the application will be returned to the personnel officer with a cover sheet indicating whether or not the applicant passed the background process. In addition, a copy of the cover sheet will be forwarded to the Sheriff and the affected Director. Without the approval of the Sheriff, applicants shall not be offered employment until after a satisfactory background investigation has been completed and it is determined that the candidate is suitable for the position which he/she has applied.